Richard BETZ and Donna
Betz, Appellees

v.

ERIE INSURANCE EXCHANGE,
Appellant.

Superior Court of Pennsylvania.

Argued Aug. 20, 2008.
Filed Sept. 22, 2008.
Reargument/Reconsideration
Denied Dec. 1, 2008.

Robert M. Runyon, III, Blue Bell, for appellant.

Martin J. Beck, Philadelphia, for appellee.

BEFORE: STEVENS, MUSMANNO and BENDER, JJ.

OPINION BY BENDER, J.:

¶ 1 Erie Insurance Exchange appeals the judgment in favor of Richard Betz and Donna Betz (the Betzes), which awarded damages on the Betzes' claims for insurance coverage under a "Sinkhole Collapse"

endorsement to the Betzes' homeowners' insurance policy. Initially, Erie raises multiple claims of error in support of an award of a new trial. These claims include, *inter alia,* error in finding the Sinkhole Collapse endorsement legally ambiguous, apportioning the burden of proof to demonstrate coverage under the policy, admitting certain testimony of the Betzes' expert while restricting other testimony by Erie's expert, instructing the jury concerning exclusions under Erie's policy of insurance, and refusing special interrogatories to the jury. In addition, Erie asserts that the trial court should properly have entered judgment notwithstanding the verdict, and the court abused its discretion in denying Erie's motion for *remittitur.* Upon review, we find Erie's claims without merit. According, we affirm the judgment of the trial court.

¶ 2 Litigation in this case follows extensive damage suffered to the Betzes' residence when, on September 18, 2004, rainfall from Hurricane Ivan infiltrated the substrate under their home, eroding support from beneath the basement floor and causing the cement to rupture. A portion of the cement slab of the basement floor subsided several inches and, over the course of the morning, water bubbled through a large crack at the point where the floor had separated, rising thirteen inches into the basement. Although the Betzes' basement was equipped with a sump pump, the pump failed due to a loss of electrical service occasioned by the storm and water continued to enter the house through the pump well over the course of the morning. The water receded by the end of the day and, upon further inspection, the Betzes observed that the floors had dropped in the garage, the laundry room, and other parts of the basement and cracks had appeared in the rooms above the basement. Proposals for work and invoices for completed repairs documented the cost of repair to be $44,151.64.

¶ 3 Over the course of some thirty years prior to these events, the Betzes purchased various policies of insurance from Erie. In 2004, they purchased the "Extracover Insurance Policy" at issue here, an "all risk" policy that provided "property protection" and "home and family liability protection" subject to numerous exclusions. Among the losses excluded from coverage under the basic policy were "earth movement" and "water damage" attributable to various enumerated causes. This exclusion provides as follows:

> We do not pay for loss resulting directly or indirectly from any of the following, even if other events or happenings contributed concurrently, or in sequence, to the loss:
>
> 1. by earth movement, due to natural or manmade events, meaning earthquake including land shock waves, or tremors before, during, or after a *Volcanic Eruption,* mine subsidence, sinkhole, landslide, mud flow, earth sinking, rising, or shifting. Direct loss by *Fire, Explosion, Sonic Boom, Theft* or *Breakage of Glass* resulting from earth movement, mine subsidence, sinkhole, landslide, mudslide, mud flow, earth sinking, rising or shifting is covered.
>
> 2. by water damage, meaning:
>
> c. water below the surface of the ground. This includes water which exerts pressure on, or flows, seeps or leaks through any part of the building or other structure, including sidewalks, driveways, foundations, pavements, patios, swimming pools or decks.

Extracoverage Insurance Policy, at 10, ¶ 2.c. (attached to Plaintiffs' Amended Complaint as Exhibit A).

¶ 4 To supplement the coverage under the "Extracoverage" policy notwithstanding the exclusions, the Betzes purchased the "Sinkhole Collapse" endorsement under which they ultimately made their claim for coverage of the loss here. That endorsement specifies as follows:

**SINKHOLE COLLAPSE ENDORSEMENT**

**DEFINITIONS**

Each word in bold type is used as defined in the policy.

**PROPERTY PROTECTION—SECTION I**

**OUR PROMISE**

For an additional premium, we will cover direct physical loss to covered property caused by:

Sinkhole Collapse, meaning actual physical damage to covered property arising out of, or caused by, sudden settlement or collapse of the earth supporting such property and only when such settlement or collapse results from subterranean voids created by the action of water on limestone or similar rock formations.

The *Section I*—Earthquake and other Earth Movement exclusion does not apply to Sinkhole Collapse.

ALL OTHER PROVISIONS OF THE POLICY APPLY.

Sinkhole Collapse Endorsement at 1. Additionally, the Betzes purchased a Limited Fungi, Wet or Dry Rot of Bacteria Coverage Endorsement, an Enhancement Endorsement, an Earthquake Coverage Endorsement, and a Replacement Cost Settlement on Personal Property Endorsement.

¶ 5 Following the events in question here, the Betzes made claims for coverage of personal property loss and loss caused by the failure of the basement sump pump to clear water from the basement, as well as a claim under the Sinkhole Collapse endorsement. Erie paid claims for personal property loss amounting to $4864.03, and loss caused by failure of the sump pump of $10,000. Nevertheless, it denied coverage under the Sinkhole Collapse endorsement, asserting that there was no limestone or "similar rock formation" under the Betz home on which water could have acted to create a sinkhole and that the damage had instead been caused by the pressure of subsurface groundwater and therefore excluded as "water damage" under the foregoing exclusion 2.c.

¶ 6 In May 2006, the Betzes filed an Amended Complaint stating claims for Breach of Contract and Relief Pursuant to the Declaratory Judgments Act. At the close of discovery, the parties filed cross-motions for summary judgment, which the trial court denied. Prior to trial, Erie filed a Motion in Limine to preclude the expert testimony of the Betzes' expert, Timothy Martin, P.E., on grounds that Martin's report failed to satisfy the *Frye* standard for admissibility, *see Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), and failed to state its conclusions with a "reasonable degree of scientific certainty." The trial court denied Erie's motion and, following a six-day trial, the jury rendered a verdict in favor of the Betzes in the amount of $48,415.38, which the court allowed the jury to record on a general verdict slip. Pursuant to Pa.R.C.P. 227.1, Erie filed a motion for post-trial relief requesting judgment notwithstanding the verdict, or in the alternative, a new trial or *remittitur*. The court denied Erie's motion in is entirety and Erie then filed this appeal raising the following questions for our review:

I. Whether the trial court abused its discretion and/or erred as a matter of law when it concluded that the "Sinkhole Collapse" endorsement contained within the Erie policy of

insurance was ambiguous as a matter of law[?]

II. Whether the trial court abused its discretion and/or erred as a matter of law when it placed the burden of proof on Defendant Erie Insurance Exchange, requiring that Erie prove that the plaintiffs' damages were not caused by a sinkhole[?]

III. Whether the trial court abused its discretion and/or erred as a matter of law when it admitted improper evidence from plaintiffs' expert, Timothy Martin, but restricted the testimony of defense expert Roy Hunt[?]

IV. Whether the trial court abused its discretion and/or erred as a matter of law in its jury charge and verdict sheet[?]

V. Whether the trial court abused its discretion and/or erred as a matter of law when it denied Erie Insurance Exchange's motion for judgment notwithstanding the verdict[?]

VI. Whether the trial court abused its discretion and/or erred as a matter of law when it refused to mold the verdict to reflect the damages requested by Mr. and Mrs. Betz[?]

Brief for Appellant at 6.

 ¶ 7 Erie's first, second, third, fourth, and sixth questions challenge the trial court's denial of Erie's motion for a new trial. Our review of such claims starts from the premise that "the decision whether to grant a new trial, in whole or in part, rests in the sound discretion of the trial court." *Mendralla v. Weaver Corp.,* 703 A.2d 480, 485 (Pa.Super.1997). Accordingly, our consideration of related questions is relatively deferential:

Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion. A new trial will be granted on the grounds that the verdict is against the weight of the evidence where the verdict is so contrary to the evidence it shocks one's sense of justice. An appellant is not entitled to a new trial where the evidence is conflicting and the finder of fact could have decided either way.

*Thomas Jefferson University v. Wapner,* 903 A.2d 565, 576 (Pa.Super.2006) (quoting *Ty–Button Tie, Inc. v. Kincel and Co., Ltd.,* 814 A.2d 685, 692 (Pa.Super.2002)).

 ¶ 8 In support of its first question, Erie argues that the trial court erred in concluding that the "Sinkhole Collapse" endorsement in the Betzes' policy was ambiguous as a matter of law. Brief for Appellant at 16. The court based its determination upon the provision's definition of a sinkhole as a "sudden settlement or collapse of the earth" resulting from the action of water on limestone "or similar rock formations." The court found this reference insufficiently clear to put the policyholder on notice of what the endorsement actually covered in that "similar rock formations" are not defined or enumerated anywhere in the policy. Trial Court Opinion, 12/19/07, at 5–6. Erie contends that the reference to "similar rock formations," if considered with specific reference to the language preceding it, renders the endorsement clear on its face. *Id.* at 17. Erie reasons that such a construction limits the coverage of the endorsement to three types of rock that have solubility characteristics similar to limestone, namely dolomite, gypsum, and halite, none of which were determined to be under the Betzes' home. Brief for Appellant at 18. We find Erie's position frivolous.

 ¶ 9 Insurance policies, like all contracts, are enforceable in accordance

with the language used and the scope of their coverage may be determined by the court as a matter of law. *See Pappas v. UNUM Life Ins. Co. of Am.*, 856 A.2d 183, 187 (Pa.Super.2004). "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Charles D. Stein Revocable Trust v. Gen. Felt Indus., Inc.*, 749 A.2d 978, 980 (Pa.Super.2000).

¶ 10 Nevertheless, other contract principles have only limited application. Indeed, our Courts have observed on multiple occasions that " 'normal' contract principles do not apply to insurance transactions." *Drelles v. Mfr's. Life Ins. Co.*, 881 A.2d 822, 836 (Pa.Super.2005). *See also Pressley v. Travelers Prop. Cas. Corp.*, 817 A.2d 1131, 1139 (Pa.Super.2003) (quoting *Collister v. Nationwide Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346, 1351 (1978)) ("Contrary to Travelers' contention, 'normal contract principals [a]re no longer applicable in insurance transactions.' "). Rather, "[t]he proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured."[1] *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa.Super.1998) (quoting *Frain v. Keystone Ins. Co.*, 433 Pa.Super. 462, 640 A.2d 1352 (1994)). Contrary to Erie's assertions here, *see* Brief for Appellant at 22, a

court's focus upon the insured's "reasonable expectations" is not limited only to situations in which the insurance contract might be deemed ambiguous, *see Pressley*, 817 A.2d at 1140. In fact, our decisions have affirmed that "regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents" insurance transactions with non-commercial insureds are subject to a review of the totality of the underlying circumstances, *Pressley*, 817 A.2d at 1139 (quoting *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 513 Pa. 445, 521 A.2d 920, 926 (1985)). Although the parties' reasonable expectations remain "best evidenced by the language of the insurance policy[,]" *Allstate Ins. Co. v. McGovern*, 2008 WL 2120722, at *2 (E.D.Pa. May 20, 2008), a court's decision to look beyond the policy language is not erroneous under all circumstances, *see Pressley*, 817 A.2d at 1139.

¶ 11 In any event, where the court finds the policy language to be ambiguous, as it did here, determination of the parties' intent poses a question of fact and extraneous evidence may be admitted to resolve it. *See Shepard v. Temple Univ.*, 948 A.2d 852, 857 (Pa.Super.2008).

A contract may be deemed ambiguous "[i]f, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning."

---

**1.** "Because the insurer is in the business of writing insurance agreements, the recent trend in insurance cases has been away from strict contractual approaches towards a view that insurance policies (and other insurance contracts) are no longer private contracts in the traditional sense (if they ever were)." The traditional contractual approach fails to consider the true nature of the relationship between the insurer and its insureds. Only through the recognition that insurance contracts are not freely negotiated agreements entered into by parties of equal status; only by acknowledging that the conditions of an insurance contract are for the most part dictated by the insurance companies and that the insured cannot "bargain" over anything more than the monetary amount of coverage purchased, "does our analysis approach the realities of an insurance transaction." *Pressley*, 817 A.2d at 1139 (quoting *Collister*, 388 A.2d at 1353).

*Young* [*v. Equitable Life Assur. Soc.*], 350 Pa.Super. 247, 504 A.2d [339,] 341 (2004). Policy language is not rendered ambiguous "if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends[.]"[2] *Id.* Mere disagreement between the parties on the meaning of language or the proper construction of contract terms does not constitute ambiguity. *See id.* *Pappas,* 856 A.2d at 187 (footnote inserted).

¶ 12 In this case, the trial court deemed the language of Erie's policy ambiguous on its face, citing the endorsement's reference to "the action of water on limestone or similar rock formations." Trial Court Opinion, 12/19/07, at 5–6, 9. The court concluded that the provision's mention of "similar rock formations" is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *See id.* Consequently, the court construed the language of the endorsement in the Betzes' favor. We find no error in this determination, as the policy language fails to describe in what manner rock formations other than limestone must be "similar" to limestone and further, fails to name any type of rock other than limestone. Although Erie asserts that the similarity of "other rock formations" referenced by the provision necessarily relates to the solubility characteristics of the respective rocks, its argument derives from the testimony of expert witnesses whose opinions were unavailable to the insureds when they purchased the endorsement.

¶ 13 In any event, the opinions of Erie's experts do not express the only possible interpretation of the endorsement, or even the one most readily understood. Despite their assertions that sinkholes can occur only in the presence of four types of rock, nothing in the endorsement's "plain language" compels so limited a reading of the coverage it makes available. Quite simply, the policy names only one type of rock when it could have named others. Moreover, although as Erie contends, the language of the provision "inextricably link[s]" the indicated "similar rocks" to limestone, Brief for Appellant at 18, it does not compel a conclusion that the similarity to be shared relates to solubility characteristics. Rather, the provision establishes only that a sinkhole must result from the "action of water" on limestone or other rocks. It does not establish the manner in which those rocks must be similar to limestone. Thus, although the linkage of solubility characteristics Erie urges is not unreasonable, it does not constitute the only reasonable interpretation of the language used.

¶ 14 Moreover, Erie's interpretation is self-serving and falls well outside the reasonable expectations of any purchaser of insurance. Following Erie's rationale, the language used would place the onus on the policyholder, although he paid a premium for extra coverage, to investi-

2. Of course, contracts may also suffer from latent ambiguity wherein language that appears clear is subject to more than one reasonable interpretation when applied to a particular set of circumstances. *See Millers Capital Ins. Co. v. Gambone Bros. Development Co., Inc.,* 941 A.2d 706, 712 (Pa.Super.2007) (quoting *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 663 (1982)) ("[A] latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous."). Due to the patent ambiguity of the language at issue, however, we need not consider latent ambiguity here. *Id.* ("A patent ambiguity is that which appears on the face of the instrument, and arises from defective, obscure, or insensible language used.").

gate the geology underlying his property and educate himself on the mechanics of sinkholes merely to discern whether to purchase the endorsement. Given the absence of a single interpretation compelling the coverage limitation Erie advocates, we find no basis for so reading a provision that delineates *extra coverage* for an *extra premium*. Accordingly, we find no error in the trial court's recognition that the operative language of the "Sinkhole Collapse endorsement" is ambiguous as a matter of law, and we find no merit in Erie's first question.[3]

¶ 15 In support of its second question, Erie contends that the trial court erred in requiring Erie to bear the burden of proof to show that the Betzes' damages were not caused by a sinkhole. Brief for Appellant at 26. Erie argues that the basic policy it issued to the Betzes excluded coverage for damage resulting even in part from earth movement or the flowing, seeping, leeking, or exertion of pressure by ˙ subsurface water. *Id.* at 27. Although Erie acknowledges that the Sinkhole Collapse endorsement effectively nullified aspects of those exclusions, it appears to contend that their existence as part of the original policy and the status of the endorsement as an amendment impose a burden of proof on the Betzes as the insureds to establish coverage. *Id.* at 26–27. Because the trial court declined to apportion the burden of proof in that manner and instead required

Erie to prove the exclusion, Erie argues that the court committed legal error. In this regard, Erie argues specifically that:

> [g]iven that the amendatory endorsement extended coverage only for a specifically defined cause of loss and removed that cause of loss from the exclusionary language of the main policy, the sinkhole endorsement can only be characterized as either a named peril coverage extension, an exception to a policy exclusion, or both. However, under either characterization the [Betzes] should bear the burden of proving a sinkhole collapse in order to trigger the application of the endorsement, and as such, the trial court erred in exempting [the Betzes] from doing so.

Brief for Appellant at 28.

¶ 16 In support of its contention that the Betzes, as insureds, must bear the burden of showing coverage, Erie analyzes one case that applies coverage under a named peril coverage extension and one that applies an exception to a policy exclusion. *Id.* at 28–29 (citing *Allen v. Ins. Co. of North America,* 175 Pa.Super. 281, 104 A.2d 191, 192 (1954) and *Lower Paxton Twp. v. United States Fid. & Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393, 399 (1989) (respectively)). In analyzing these cases, however, Erie does not fully reconcile the

---

**3.** Erie also argues that the trial court improperly applied a subjective standard to determine whether the Sinkhole Collapse endorsement was ambiguous. Brief for Appellant at 21. To support its claim, Erie cites the trial court's observation that "[t]his individual [Mr. Betz] is of a ninth grade education. He is not a geologist. And why should he be bound by the specific testimony of geology experts?" *Id.* (citing N.T., 3/5/07, at 192). We recognize that the presence of ambiguity is generally measured by an objective standard. *See Consulting Eng'rs, Inc. v. Ins. Co. of North America,* 710 A.2d 82, 85 (Pa.Super.1998) ("Only

where reasonably intelligent men, considering the word in the context of the entire policy, would honestly differ as to its meaning, will an ambiguity be found."). Nevertheless, we do not find the trial court's reference a source of error. Regardless of whether the standard applied invokes the expectation of the "reasonable man" or subjectively defers to those of the actual purchaser of the policy, in this case, the ambiguity of the policy language is so pronounced as to support only the conclusion that the language is in fact ambiguous and, therefore, must be interpreted against Erie as the drafter.

fact that the policy it issued to the Betzes was an "all-risks" policy that by definition "covers every kind of insurable loss except what is specifically excluded."[4] BLACK'S LAW DICTIONARY 815 (8th ed.2004); *see also Miller v. Boston Ins. Co.,* 420 Pa. 566, 218 A.2d 275, 278 (1966) ("[A] policy against 'all risks,' ... ordinarily covers every loss that may happen, except by the fraudulent acts of the insured."). Nor, in asserting technical distinctions between coverage extensions and exclusions, does Erie acknowledge the long standing mandate of our jurisprudence that all portions of an insurance contract must be read together. Indeed, its argument appears to treat the point in the policy at which the exclusion appears as the dispositive element in determining where the burden of proof must rest to show whether an event is covered. Under Erie's construct, it would appear that if an exclusion appears in the language of the primary policy, the burden rests on the insured to establish coverage even if the insured later purchases an endorsement that nullifies the terms of that exclusion. This distinction, which seeks to redirect the burden of proving coverage depending upon whether and when the endorsement is purchased poses an artificial distinction that cannot be squared with the rules governing interpretation of contracts, the reasonable expectations of the insured, or the legal basis of an "all-risks" policy.

¶ 17 Our Supreme Court has long recognized that "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." *Miller,*

218 A.2d at 278. Nevertheless, "[a] defense based on an exception or exclusion in a policy is an affirmative one, and the burden is cast upon the defendant to establish it." *Id.* Interpreting *Miller,* this Court has recognized that "[i]n an action based upon an 'all risks' insurance policy, the burden is upon the insured to show *that a loss has occurred;* thereafter, the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion." *Wexler Knitting Mills v. Atlantic Mut. Ins. Co.,* 382 Pa.Super. 405, 555 A.2d 903, 905 (1989) (citing *Miller,* 218 A.2d at 278) (emphasis added).

¶ 18 Although Erie's argument acknowledges *Wexler* and *Miller,* it construes their language to require not that the insured must demonstrate a "loss," as *Wexler* requires, but that the insured must instead demonstrate coverage under the terms of the policy, Brief for Appellant at 26, such that if an exclusion appears in the form contract, the insured is automatically denied coverage because he can show no entitlement to it and the insurer is relieved of any obligation to prove an affirmative defense. Such an analysis applies *Miller's* language far too expansively and openly contradicts our holding in *Wexler.* Regardless of whether the loss in question is cognizable under the language of the basic policy or under an endorsement purchased separately, that loss is "a claim within the coverage provided by the policy." *Miller,* 218 A.2d at 278. So long as reasonable people could conclude that the claimed loss is covered by language anywhere in the policy *or* the amendatory endorsements,

---

4. Neither of the cases Erie cites involved an "all-risks" policy. In *Allen,* the plaintiff made a claim under a policy of fire insurance, while in *Lower Paxton Township,* the township sought recovery for damage suffered to a third party under a general liability policy. Moreover, in *Lower Paxton Township,* this Court disposed of the appeal on the basis of the lack of ambiguity in the language of the underlying policy. Accordingly, we find neither of these cases compelling in their consideration of any issue before us on the question of burden of proof.

the insured has carried his burden as concerns an "all-risks" policy. Any other construct would merely encourage insurers to orchestrate a shell game of exclusions and exceptions to exclusions (or "named peril coverage extensions"), Brief for Appellant at 28, in full recognition that the ultimate risk of loss would rest upon the insured notwithstanding his payment of an extra premium for coverage he reasonably thought he was getting.

¶ 19 Such a conclusion is consistent with authority elsewhere, which recognizes that as concerns first-party claims, the burden of proof under an "all-risk" policy shifts to the insured only after the insurer has established some exclusion enumerated by the contract terms. *See Strubble v. United Services Auto. Assn.*, 35 Cal.App.3d 498, 110 Cal.Rptr. 828, 832 (1973) (concluding that insurer had the burden of showing that loss to insureds was proximately caused by the excluded peril of earth movement other than earthquake, which was an included peril); *see also Travelers Cas. & Sur. Co. v. Superior Court*, 63 Cal.App.4th 1440, 1453–55, 75 Cal.Rptr.2d 54, 62–63 (1998) (limiting rule in *Strubble* to first party claims). In *Travelers*, the California Court of Appeals explained *Strubble*, and recognized the limitation it imposes on the burden of proof to be assigned the insured making a first party claim under an "all-risks" policy:

> [T]he court in *Strubble* determined that an insured who makes a first party claim under an all-risks homeowners policy *has no burden of proof.* In effect, there

is a presumption of coverage, which the insurer has the burden to rebut by proving that the claim falls within a specific policy exclusion. Since the insured has no initial burden to prove that his first party claim falls within the basic scope of coverage of the all-risks policy, it follows, under *Strubble*, that the insured has no burden to prove that coverage is restored by an exception to the exclusion. Thus, because only the insurer had a burden of proof regarding coverage under the all-risks homeowners policy at issue in *Strubble*, it was the insurer who was required to negate the earthquake exception to the earth movement exclusion.

*Id.* We find the California courts' treatment of the burden of proof consistent with our own as enunciated in *Wexler*. We conclude accordingly that the trial court did not err in apportioning the burden of proof at trial.[5]

¶ 20 In support of its third question, Erie asserts that the trial court admitted improper testimony proffered by the Betzes' expert, Timothy Martin, while erroneously restricting the testimony of Erie's expert, Roy Hunt. Brief for Appellant at 31. In support of its claims concerning the Betzes' expert, Erie contends that his testimony failed to satisfy the prerequisites for admissibility established in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), and that, accordingly, the trial court erred in denying Erie's motion in limine to exclude his testimony in its

---

5. To counter the Betzes' reliance on *Strubble*, Erie cites as persuasive authority the memorandum opinion and findings of fact and conclusions of law of a magistrate judge in the United States District Court for the Eastern District of Pennsylvania. *Id.* (citing *S.R.P. Management Corp. v. Seneca Ins. Co.*, 2008 WL 2039466 (E.D.Pa. May 13.2008)). Erie argues that this decision "soundly reasoned that once the insurer proved an excluded loss,

the burden of proof falls squarely on the policyholder to establish that an exception to the exclusion provides coverage under the policy." Supplemental Brief of Appellant at 1. Of course, the authority Erie cites is not binding on this Court. Moreover, we find it no more compelling than the argument in Erie's original brief which, as discussed, *supra*, would merely empower insurers to manipulate the burden of proof by sleight of hand.

entirety. Brief for Appellant at 31–32. In addition, Erie contends that the expert's opinions fell below the requisite standard of a "reasonable degree of scientific certainty" in that two references indicated "possible" causes of the collapse of the floor in the Betzes' basement. *Id.* at 32–33.

¶ 21 Concerning Erie's first assertion, challenging compliance of the expert's opinion with the *Frye* standard,[6] Erie alleges that the Betzes failed to establish that their expert used any accepted methodology to reach his conclusions. Brief for Appellant at 32. This claim fails on two bases. First, Erie fails to suggest why the proposed testimony of the Betzes' expert constituted "novel scientific evidence." *See Trach v. Fellin,* 817 A.2d 1102, 1109 (Pa.Super.2003) (concluding that *Frye* test to determine admissibility of expert testimony only applies when a party seeks to introduce novel scientific evidence). More importantly on this record, however, Erie failed entirely to pose any *Frye*-related argument to the trial court. N.T., 2/28/07, at 6–9. Indeed, Erie's motion in limine, as well as the argument it offered at trial, asserted that the expert's opinion was deficient because in certain passages, his report expressed more than one possible cause for the collapse beneath the Betzes' house and did not consistently state his conclusions "to a reasonable degree of scientific certainty." *Id.* Because Erie raises its *Frye*-related claims for the first time on appeal, those claims are waived by operation of the Rules of Appellate Procedure. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Accordingly we decline to consider the merits of the related claims.

¶ 22 Concerning Erie's second assertion, that the court erred in admitting the expert's testimony because his opinions fell below the requisite standard of a "reasonable degree of scientific certainty," we find no reversible error. Initially, we note that "[t]he admission of expert testimony is a matter of discretion [for] the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion." *Blicha v. Jacks,* 864 A.2d 1214, 1218 (Pa.Super.2004). Indeed, admission of the disputed testimony "must be shown to have been not only erroneous but also harmful.... Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment." *Detterline v. D'Ambrosio's Dodge, Inc.,* 763 A.2d 935, 940 (Pa.Super.2000) (quoting *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 707 (Pa.Super.2000)).

¶ 23 We recognize, of course, that "to be competent, expert testimony must be stated with reasonable certainty." *Peerless Dyeing Co., Inc. v. Industrial Risk Insurers,* 392 Pa.Super. 434, 573 A.2d 541, 547 (1990). The purpose of this standard is not, however, to render proof needlessly difficult, but to avoid speculation under the rubric of "expert opinion." Accordingly, "[i]t is not enough to say that something could have happened. Anybody can guess. Expert testimony must assert that it is the professional opinion of the witness that the result in question came from the cause alleged." *Woods v. Pleasant Hills Motor Co.,* 454 Pa. 224, 309 A.2d 698, 703 (1973). Nevertheless,

6. "The *Frye* standard is simply whether the party proffering ... novel scientific evidence has demonstrated that the principles and methodology the scientist employed has gained general acceptance in the relevant [scientific] community." *A.J.B. v. M.P.B.,* 945 A.2d 744, 749 (Pa.Super.2008).

[i]n determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety. *Carrozza v. Greenbaum,* 866 A.2d 369, 379 (Pa.Super.2004) (citation omitted). "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* (citation omitted). Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, "reasonable degree of medical certainty." *See Commonwealth v. Spotz,* 562 Pa. 498, 756 A.2d 1139 (2000) (indicating that "[i]n this jurisdiction, experts are not required to use 'magic words'" but, rather, "this Court must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation").

*Griffin v. Univ. of Pittsburgh Med. Center–Braddock Hosp.,* 950 A.2d 996, 1000 (Pa.Super.2008) (quoting *Vicari v. Spiegel,* 936 A.2d 503, 510–11 (Pa.Super.2007)). Consequently, an expert's "failure to state an opinion with such certainty need not be fatal if we could look to his testimony in its entirety and find that it expresses reasonable certainty." *Peerless Dyeing Co., Inc.,* 573 A.2d at 547.

¶ 24 Upon review of the testimony offered by the Betzes' expert, we find its expression sufficiently clear and its conclusion sufficiently certain to satisfy the foregoing standard. On direct examination, the witness explained that the Betzes' home sits atop the Martinsburg Formation, an ancient deposit of sedimentary rock consisting of shale, silt stone, sandstone, silty limestone, and shaley lime. N.T., 3/1/07, at 101. He then explained how the action of water on those rock formations had gradually, over a period of centuries, created voids that allowed the earth under the Betzes' house to fall away, depriving the foundation slab of support and causing it to collapse under its own weight. *Id.* at 105–110. The portion of the testimony Erie cites in support of its assertion begins with cross-examination of the witness on the poor construction technique used in pouring the slab beneath the Betzes' home during which the witness recognized the inherent deficiency. N.T., 3/1/07, at 135–136. Following that discussion, Erie's counsel challenged the witness, characterizing his earlier opinion concerning the cause of the loss of support beneath the foundation as an attribution of causation to two different causes. The witness unequivocally disabused counsel of this premise, however, and opined that the purportedly different causes were, in fact, the same thing. The following exchange is illuminating:

Q. Now this process that you talked about, basically the first scenario, that's essentially erosion, what you described, isn't it?

A. Subsurface erosion. The transportation of any kind of material—any material in water is by definition erosion.

Q. And you also talked in scenario number two about the possibility of a sinkhole.

A. Right.

Q. The process you described in process number one is different and distinct from the process that you talked about in process number two, isn't it?

A. No.

Q. They're the same thing?

A. They—yes. If I may, the voids created in a carbonate geology, in a limestone or dolomite, occur over hun-

dreds of thousands of years. It's the slow dissolution of the calcite mineral within the limestone. So there's these huge voids, and voids all over the place in the rock.

As they become interconnected and find their way up to the rock surface and water is introduced from the ground surface or groundwater is already present, the soils start to migrate into these interconnected voids; i.e., erosion. And as this erosion continues to work its way up higher into the ground surface, at the point where it exposes itself, expresses itself at the ground surface, it's called a sinkhole. But a very integral part of the sinkhole process is subsurface erosion.

*Id.* at 139–40. This exchange bears directly on Erie's claim here—and facially contradicts it. The expert attributed the damage suffered by the Betzes' home to one cause, not two. Accordingly, Erie's assertion that the expert's testimony failed to achieve the requisite degree of certainty because it offered divergent possibilities for the cause of the collapse erects a false premise that is, at best, contrived. The expert's testimony appears fully competent and nothing in Erie's argument establishes reversible error in the trial court's ruling to admit it.

¶ 25 Concerning the trial court's limitation of the testimony of Erie's own expert, Roy Hunt, Erie argues that the court abused its discretion in refusing to allow an opinion of whether two photographs supported his opinion of the cause of the damage suffered by the Betzes' home. Brief for Appellant at 34. Erie asserts that the two photographs showed water "spouting from cracks and bore holes in the basement in October 2005." *Id.* Hunt had opined that the damage at issue, which occurred in September *2004,* resulted from a build-up of subterranean

water pressure which, ostensibly, would not be a covered event under the sinkhole endorsement. Later, when counsel for Erie produced the photos in question, the court sustained the Betzes' objection on the ground that the photos were beyond the scope of the expert's report. We find no error in the court's ruling. Hunt offered a report concerning the cause of damage that occurred over a year prior to the date on which the photos in question were taken. The photos were not included in the report and the report does not establish how photos taken so long after the event in question could possibility establish why that event occurred. Absent such a foundation, the very relevance of the photos is itself debatable. Accordingly, we find no merit in this claim.

¶ 26 In support of its fourth question, Erie contends that the trial court provided a charge that was vague and confusing and erred in failing to instruct the jury on the relevant coverage exclusions in the policy. Brief for Appellant at 38. Erie also contends that the court erred in failing to require the jury to answer special interrogatories as part of the verdict slip. *Id.* at 41. Concerning claims of error surrounding the court's charge to the jury, our Courts have often reaffirmed the limits of appellate review:

We will grant a new trial based on error in the court's charge if, upon considering all the evidence of record we determine that the jury was "probably misled" by the court's instructions or that an omission from the charge amounted to "fundamental error." *Price v. Guy,* 558 Pa. 42, 735 A.2d 668, 671 (1999); *see also Carpinet v. Mitchell,* 853 A.2d 366, 371 (Pa.Super.2004). Conversely, "[a] jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations." *Cruz v.*

*Northeastern Hosp.*, 801 A.2d 602, 611 (Pa.Super.2002).

In accordance with this prescription, "all issues which are relevant to pleadings and proof may become the subject of jury instructions." *Carpinet*, 853 A.2d at 371. Although the court's instructions "should not exclude any theory or defense that has support in the evidence," *McClintock v. Works*, 716 A.2d 1262, 1266 (Pa.Super.1998), the court may charge "only on the law applicable to the factual parameters of a particular case and it may not instruct the jury on inapplicable legal issues." *Cruz*, 801 A.2d at 611.

*Angelo v. Diamontoni*, 871 A.2d 1276, 1279 (Pa.Super.2005); *see also Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 907 A.2d 1061, 1069–70 (2006). Accordingly, "[a] trial judge is not required to refer to the testimony of every witness in reviewing the evidence in the case nor refer to every contention made by counsel in his presentation to the jury." *Finnerty v. Darby*, 391 Pa. 300, 138 A.2d 117, 127–28 (1958).

¶ 27 In this instance, Erie contends that the trial court erred in not reading the exclusions of the insurance policy to the jury verbatim. Brief for Appellant at 39. Erie argues that this omission, combined with the instruction of the court regarding Erie's burden of proof, "left [the jury] with the impression that, regardless of the evidence presented, Erie was bound to provide coverage for all of the Betz's [sic] damage." *Id.* Nevertheless, Erie fails to cite even a single source of authority that requires the court to recite policy exclusions. Moreover, we are aware of none. In point of fact, the court did read the Sinkhole Collapse endorsement and instructed the jury on Erie's contention that the loss the Betzes claimed was not covered under that endorsement.

N.T., 3/6/07, at 202. In addition, Erie, during its case in chief, called claims adjuster Michael W. Free to read aloud the exclusions that Erie deemed applicable. N.T., 3/2/07, at 51–56, 61–62. Accordingly, the jury was apprised of the specific language of the exclusions that Erie asserted and was instructed by the court on how to consider it. In view of the record compiled for the jury, coupled with the court's specific instruction on Erie's theory of the case, including the Sinkhole Collapse endorsement, we find no support for an award of a new trial as Erie requests.

¶ 28 Erie's companion claim that the court issued a vague and confusing charge falls similarly wide of the mark. Erie argues that the court erred specifically in refusing to rephrase the language of "Addendum No. 17" to the charge, wherein the court instructed on its determination that the term "limestone or similar rock" appearing in the Sinkhole Collapse endorsement is ambiguous. Brief for Appellant at 40. Unfortunately, Erie cites no authority to support this section of its argument and, consequently, we deem its related assertion waived. *See* Pa.R.A.P. 2119(a); *see also Estate of Lakatosh*, 441 Pa.Super. 133, 656 A.2d 1378, 1381 (1995) (deeming claims of error waived where appellant failed to cite pertinent authority in support). Moreover, we note that the claim is without merit. A trial court has wide discretion in choosing the language of its instructions to the jury. *See Janis v. AMP, Inc.*, 856 A.2d 140, 147 (Pa.Super.2004). So long as the resulting expression adequately conveys the required information, we will not deem it grounds for a new trial. *See id.* In this instance, the alleged flaw in the court's language amounts to no more than its failure to impose Erie's theory of the case. The court did not err in refusing to rephrase the instruction.

¶ 29 In its final argument in support of this question, Erie raises the distinct issue of the court's refusal to provide special interrogatories to the jury upon which the jurors' findings could have been separated into more detail. Brief for Appellant at 41. Although Erie acknowledges that the use of special interrogatories in a given case is discretionary with the trial court, it argues that this case involves "several important and distinct issues" concerning which special interrogatories would have been appropriate. Brief for Appellant at 41–42. We find this claim unconvincing.

¶ 30 "Generally, a trial judge may grant or refuse a request for specific findings on the basis of whether such would add to a logical and reasonable understanding of the issue." *Walsh v. Pennsylvania Gas & Water Co.*, 303 Pa.Super. 52, 449 A.2d 573, 577 (1982) (quoting *Willinger v. Mercy Catholic Medical Center*, 482 Pa. 441, 393 A.2d 1188, 1190 n. 4 (1978)). Thus, where the evidence in the case is such that the use of special interrogatories may be helpful to the jury in understanding the issues for decision, a request for such special findings may be granted. Nevertheless, "[t]o permit the jury to return special findings, where they are unnecessary, can create misleading issues and defeat justice." *Id.* (quoting *Willinger*, 393 A.2d at 1190 n. 4).

¶ 31 In view of this limitation on the proper use of interrogatories, we find Erie's position perplexing. Erie appears to contend that the court oversimplified the case in focusing the jury's attention on the Sinkhole Collapse endorsement as the pivotal element of the case, suggesting that exclusions in the body of its policy remained at issue. Brief for Appellant at 42. Ostensibly to redirect the jury's attention to those provisions of the policy, Erie offered the court a verdict sheet composed of 35 separate questions. *Id.* Unfortunately, Erie offers no explanation of why so extensive a roster of questions was necessary or how it might have assisted the jury in any meaningful way. Recognizing the surplusage of Erie's submission, the court denied its request and rejected the interrogatories stating "it's like amazing that we would ask them that." N.T., 3/5/07, at 227. Given the prolixity of Erie's submission, we concur in the trial court's assessment. It did not err in refusing Erie's special interrogatories.

¶ 32 In support of its fifth question, Erie contends that the trial court erred in refusing to grant judgment notwithstanding the verdict (JNOV) on two bases. First, Erie contends that the undisputed evidence established that the cause of the damage the Betz property sustained was not in fact a sinkhole, but the shoddy construction technique used in pouring the basement slab on which the home was erected. Brief for Appellant at 44. Second, Erie contends that given that earth movement and water below the surface of the ground were agents in causing the collapse of the Betzes' basement, the collapse was excluded as a covered loss by the anti-concurrent cause provision in the earth movement exclusion of the basic policy. *Id.* at 48–50. We shall address these claims in sequence.

Our scope of review with respect to whether JNOV is appropriate is plenary, as with any review of questions of law. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995). It is axiomatic that, "[t]here are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Moure v.*

*Raeuchle,* 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (citations omitted). To uphold JNOV on the first basis, we must review the record and conclude "that even with all the factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second [we] review the evidentiary record and [conclude] that the evidence was such that a verdict for the movant was beyond peradventure." *Id.*

When we review a motion for JNOV, we must consider the evidence in the light most favorable to the verdict winner, who must receive "the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Id.* (citing *Broxie v. Household Finance Co.,* 472 Pa. 373, 372 A.2d 741, 745 (1977)). Any doubts must be resolved in favor of the verdict winner, and JNOV should only be entered in a clear case. *Id.*

*Rohm and Haas Co. v. Continental Cas. Co.,* 566 Pa. 464, 781 A.2d 1172, 1176 (2001).

■ ¶ 33 Erie's first claim, asserting that shoddy construction practice was the cause of the collapse, blatantly mischaracterizes the record and conflates cause and effect. Contrary to Erie's assertion, none of the evidence of causation was "undisputed;" indeed, all such evidence was strongly contested by the parties. Although Erie's experts refused to characterize the condition that damaged the Betz property as a sinkhole, the Betzes' expert, whose testimony we discussed, *supra,* described a process of erosion that occurred under the cement slab over time and did form a sinkhole as soil fell away into voids created in the rock formations underlying the house. N.T., 3/1/07, at 139–140. Although the expert did criticize the "slab on grade"

technique used to build the Betzes' home, he did not describe it as the cause of the loss they suffered. In point of fact, each of the experts who testified, two for Erie and one for the Betzes, suggested different causes for the damage to the home. Consequently, the evidence is not such that "no two reasonable minds could disagree." Reasonable minds did disagree and the jury was entitled, indeed required, to determine which of the respective opinions offered more closely comported with the facts of the case. Erie's assertion to the contrary that undisputed evidence established a cause for the collapse other than a sinkhole is simply not sustained by the record.

■ ¶ 34 Erie's second claim, that the "undisputed evidence" established that the Betzes' loss was caused by events outside the "anti-concurrent cause" provision of the earth movement exclusion, is similarly meritless. In support of its assertion, Erie employs one provision of the underlying policy which excludes coverage for damage caused by "bulging, cracking, expansion, settling or shrinking in ceilings, foundations, floors ...," Brief for Appellant at 47–48, and a second that excludes coverage for earth movement caused by water, *id.* at 48. Initially, we note that Erie's argument depends in its entirety on the premise that the damage sustained by the Betzes' property resulted from subsurface water pushing upward against the concrete slab under the house. *Id.* at 48–49. This view reflects the opinion of one of Erie's experts which, not surprisingly, was rebutted in detail by the Betzes own expert, Timothy Martin, P.E. N.T., 3/1/07, at 110–112. Martin stated specifically, "I do not think that's a plausible explanation for the crack in the basement." *Id.* at 110. Accordingly, the notion that all of the evidence established the applicability of either of the exclusions on which Erie relies is a fiction.

To impose either exclusion, the jury would have to accept the veracity of Erie's expert's opinion which, of course, it was free to disregard. Although the jury could have accepted that testimony and applied the exclusions on which Erie relies, it chose not to do so. Such action was well within its province as fact finder and does not serve as grounds for entry of JNOV.

¶ 35 Finally, in support of its sixth question, Erie asserts that the trial court erred in denying Erie's motion for remittitur to reduce the jury's award to reflect the amount of damages for which the Betzes produced invoices or repair estimates. Brief for Appellant at 50. Erie argues that because those figures total only $44,151.64, the jury's award of $48,415.38 should be reduced. *Id.* at 51. Erie argues that "a compensatory damage award 'must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by uncontroverted evidence at trial.'" *Id.* at 50–51 (quoting *Neison v. Hines*, 539 Pa. 516, 653 A.2d 634, 637 (1995)). Significantly, however, Erie concedes that the goal of contract damages is to "make the plaintiff whole again, by awarding the non-breaching party a sum that would put them in as good a position as he/she would have been had the contract been performed." *Id.* at 50 (quoting *Trosky v. Civil Serv. Comm'n*, 539 Pa. 356, 652 A.2d 813, 817 (1995)). Based upon the foregoing authority, which Erie acknowledges, we find no error in the trial court's determination that remittitur was not required.

¶ 36 Where an appellant's claim arises from a challenge to the jury's determination of damages, our review is highly circumspect:

"The duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence." *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 275 A.2d 296, 299 (1971) (citation omitted). "In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence." *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983).

*Ferrer v. Trustees of University of Pennsylvania*, 573 Pa. 310, 825 A.2d 591, 611 (2002). "If the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we might have awarded different damages." *McManamon v. Washko*, 906 A.2d 1259, 1285 (Pa.Super.2006).

¶ 37 In this case, the Betzes' damage witness, Timothy R. Kline, provided repair invoices and estimates and testified at trial concerning the content of each. N.T., 3/1/07, at 52–62. Kline testified also that the numbers he provided reflected the cost of repairs in 2004 and that the cost would increase at a rate of approximately four percent per year thereafter. *Id.* at 75–76. Extrapolating from Kline's testimony, when this case came to trial in 2007, the cost of repair would have risen approximately twelve percent or $5298.20. Erie did not dispute Kline's testimony. Accordingly, the undisputed evidence established that in 2007, the cost to repair the Betzes' property would have been $49,449.84, an amount that exceeds the award by approximately $1000. Consequently, we find nothing in the record to substantiate Erie's claim for remittitur.[7]

---

7. Erie also asserts, summarily, that the trial court erred in not reducing the verdict to reflect Erie's payment of $10,000 related to the failure of the Betzes' sump pump to func-

¶ 38 For the foregoing reasons, we affirm the judgment in favor of the Betzes.

¶ 39 Judgment **AFFIRMED.**

tion during the hurricane that precipitated the damages at issue here. However, Erie provides neither analysis nor citation to authority to support remittitur on such a basis. Accordingly, we deem that claim waived. *See*

*Estate of Lakatosh,* 656 A.2d at 1381 (deeming claims of error waived where appellant failed to cite pertinent authority in support).

