NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2410
_____

JOSEPH JUGAN; ROBIN JUGAN,

Appellants

v.

ECONOMY PREMIER ASSURANCE COMPANY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-15-cv-4272 )
District Judge:  Hon. Jeffrey L. Schmehl
_____

Submitted Under Third Circuit LAR 34.1(a)
March 12, 2018

Before:  JORDAN, KRAUSE, and GREENBERG, *Circuit Judges*

(Filed: March 22, 2018)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Joseph and Robin Jugan appeal from the grant of summary judgment against them on their claim that Economy Premier Assurance Company ("MetLife")[1] breached an insurance contract. We will affirm.

## I. Background[2]

The Jugans own a home in Fleetwood, Pennsylvania, which they insured under a homeowners insurance policy (the "Policy") issued by MetLife. "Coverage A" in the Policy said that MetLife would "pay for sudden and accidental direct physical loss or damage to the property …, except as excluded in SECTION I – LOSSES WE DO NOT COVER." (J.A. at 139.) Section I, in turn, excluded from any coverage losses or damage resulting directly or indirectly from "freezing of a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or of a domestic appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing." (J.A. at 141.) That "Absolute Freezing Exclusion" stated that it did "not apply if you have used reasonable care to maintain heat in the building or if you shut off the water supply and drained the plumbing and appliance of water." (J.A. at 141.)

Sometime between February 1, 2015, and March 13, 2015, while the Jugans were away, water leaked from their dishwasher, causing damage to their home and its contents.

---

[1] Economy Premier Assurance Company's parent company is MetLife, Inc. Because the parties and the District Court refer to the Defendant as MetLife, we do likewise.

[2] The facts set forth here are in the light most favorable to the Jugans. *See infra* note 4.

Mr. Jugan contacted MetLife the day after he discovered the water damage to report the loss and to file a claim for coverage under the Policy. MetLife hired an expert, a certified engineer, to investigate the loss. He did so and issued a report stating that the water damage was due to a frozen dishwasher solenoid valve that fractured due to freezing in the water supply line to the dishwasher. He further concluded that the water froze because of insufficient heat within the home, which he "attributed to the thermostat for the hot water baseboard heat [having been] set too low[.]" (J.A. at 274.) His research led him to report that the outside temperatures in the area during the relevant timeframe were "adequate to cause piping system freezes." (J.A. at 275.) And he concluded that hot water continuously leaked from the broken dishwasher solenoid valve after the water in the supply line thawed, which caused the fuel-fired boiler that provided hot water for the first-floor heating system to fail after the fuel oil tank ran dry.[3] The Jugans offered no evidence rebutting those expert conclusions.

The Jugans' home included a main floor and a walkout basement. The dishwasher was in the kitchen on the main floor, and the water supply lines to the dishwasher ran along the basement ceiling, below the kitchen floor. The main floor was heated using a forced hot air system, and its temperature was controlled by a digital thermostat. The basement was heated using two hot water baseboard radiators, and the temperature was controlled by an analog thermostat. Neither basement radiator was located below the kitchen. The Jugans had the home's heating system serviced during the summer of 2014,

---

[3] Hot water from the fuel-fired boiler was used both to service the hot water baseboards in the basement and to heat the air that flowed to the main floor through a forced air system.

at which time the radiators in the basement were replaced. Mr. Jugan stated that he wanted to be present when the new radiators were turned on so that he could test them for leaks. But he never did test the new radiators, and he testified that there was no way to know whether they worked at all before the water damage occurred.

Since 2009, the Jugans had frequently left the home empty, sometimes for weeks at a time. Mrs. Jugan moved to Massachusetts in 2009 and did not live in the Pennsylvania home after that time. In October 2014, Mr. Jugan's mother became terminally ill and Mr. Jugan began to spend most of his time with her in New Jersey. He did not set the thermostat at any particular temperature when he left the house in October 2014. After Mr. Jugan's mother passed away on January 1, 2015, he continued to spend most of his time away from the home until March 13, 2015. His last time at the home before the dishwasher leak was February 1, 2015, when he was present for only one or two hours. He did not remember much about that visit because he was "very much in withdrawal" from medication he had been on that caused his recollection to be "kind of a haze." (J.A. at 145.) Mr. Jugan suffers from a brain tumor that requires him to take prescription narcotics. The tumor and the medications have led to forgetfulness, including a failure to recall events. He did not remember adjusting the digital thermostat on the main floor, and he could not definitively state whether the thermostat was set at 62°F before he left. He also did not remember adjusting the analog thermostat in the basement, and he could not remember the temperature it was set at when he left that day. But Mr. Jugan testified that he kept a thermometer on an interior wall of the basement, and that it generally read 54°F year round.

4

Mr. Jugan watched weather reports for the Fleetwood, Pennsylvania, area between February 1 and March 13. He saw that the weather was cold and snowy. In fact, MetLife's expert reported that the low temperature in nearby Reading, Pennsylvania, was between -1°F and 8°F on at least six days in mid-February.

Mr. Jugan testified that neighbors had access to the Jugans' home, and he had sometimes asked them to check on the house while he was away. He did not, however, ask his neighbors to check on the home between February 1 and March 13.

The Jugans sued MetLife for breaching the Policy after MetLife denied coverage. MetLife moved for summary judgment on that claim. When it did so, Mr. Jugan filed an affidavit containing averments that he said raised genuine issues of material fact barring summary judgment. The District Court applied the sham affidavit doctrine, striking certain averments that contradicted Mr. Jugan's earlier testimony without sufficient explanation, while crediting other averments that did not contradict other evidence in the record. The Court rejected Mr. Jugan's averment that, when he "traveled away from his house during the winter of 2014-2015[,] he set the thermostat on the main level of his house at 62 degrees Fahrenheit and set the thermostat in the basement at its low setting." (J.A. at 14.) The District Court said that statement contradicted Mr. Jugan's earlier testimony that he could not definitively state whether the thermostat on the main floor was set at 62°F. But the Court credited Mr. Jugan's averments that it was his habit to leave the thermostat on the main level set to 62°F, that "the heat in the main level of the house was turned on and the house felt warm," or "approximately 62 degrees Fahrenheit," when he left on February 1, that it was his habit to leave the basement

5

thermostat turned on and set to its low setting of 40°F, and that the Jugans had used the same basement heat setting in the past without experiencing freezing problems despite similarly cold outside temperatures. (J.A. at 16.)

The District Court granted summary judgment in favor of MetLife with respect to the Jugans' claim under Coverage A of the Policy, after deciding that no reasonable jury could find that the Jugans had used reasonable care to maintain heat in their home. The Jugans timely appealed.

## II.     Discussion[4]

We agree with the District Court's thorough analysis and conclusion that the Jugans cannot recover under the Policy. Pennsylvania law provides that "[t]he interpretation of an insurance policy is a question of law." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins.*, 908 A.2d 888, 897 (Pa. 2006). The "primary goal in interpreting a policy" is to determine "the parties' intentions as manifested by the policy's terms." *Id.* We thus must give effect to the Policy's "clear and unambiguous" language. *Id.* (quoting *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 170 (Pa. 2005)).

---

[4] The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. *Nationwide Mut. Ins. v. CPB Int'l, Inc.*, 562 F.3d 591, 595 (3d Cir. 2009). Summary judgment is appropriate when there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In reviewing a summary judgment ruling, we consider the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248-49.

State substantive law governs which party bears the burden of proof in a diversity case. *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996). Pennsylvania law places the initial burden of establishing the existence of insurance coverage on the insured. *Nationwide Mut. Ins. v. Cosenza*, 258 F.3d 197, 206 (3d Cir. 2001) (citing *Erie Ins. Exch. v. Transamerica Ins.*, 533 A.2d 1363, 1366-67 (Pa. 1987)). After the insured has met that burden, the burden shifts to the insurer to prove the applicability of an exclusion in the insurance policy. *Erie Ins. Exch.*, 533 A.2d at 1366-67. If the insurer demonstrates that an exclusion applies, the burden shifts back to the insured to prove an exception to the exclusion, such that the damages claimed are covered notwithstanding the exclusion. *TIG Specialty Ins. v. Koken*, 855 A.2d 900, 915 (Pa. Commw. Ct. 2004).

It is undisputed that the Jugans met their burden of establishing that the loss they suffered falls within the Policy's affirmative grant of coverage – specifically, Coverage A. Furthermore, we agree with the District Court's conclusion that MetLife met its burden of proving the applicability of the Policy's Absolute Freezing Exclusion. MetLife's expert concluded that insufficient heat in the Jugans' home caused water in the supply line to the dishwasher to freeze, which caused the dishwasher solenoid valve to fracture. The expert stated that, when the water supply line thawed, hot water was constantly supplied to the dishwasher and then leaked through the cracked valve, causing the fuel oil tanks powering the home's boiler to run dry. The Jugans did not provide any evidence to rebut that expert's determination that the water leakage was due to freezing.

Thus, we must consider whether the Jugans met their burden of demonstrating an exception to the Absolute Freezing Exclusion.

The exception at issue here hinges on whether the Jugans used reasonable care to maintain heat in their home.[5] They argue that the District Court erred in concluding that they did not meet their burden of showing reasonable care, and they give five reasons: first, there is sufficient evidence to demonstrate that they used reasonable care to maintain heat in the home; second, the Court improperly excluded facts alleged in Mr. Jugan's affidavit after misapplying the sham affidavit doctrine; third, reasonable care is a fact-intensive question reserved solely for resolution by a jury; fourth, the Court failed to account for Mr. Jugan's disability; and, finally, the District Court failed to consider the Jugans' expectation of coverage. Those arguments are ultimately unpersuasive.

First, the Jugans have not pointed to evidence showing that they used reasonable care to maintain heat in their home. They argue that, because Mr. Jugan testified that he only asked his neighbors to check on the home if he thought he had forgotten to do something, the District Court erred by relying on Mr. Jugan's testimony that his neighbors had access to the home, had previously been asked to check on the home at other times, and were never asked to check on the home before the loss that occurred here. But establishing a reason for failing to ask a neighbor to check on the home is not in itself evidence of reasonable care. It is also irrelevant that the Jugans had previously

---

[5] The Jugans do not dispute the District Court's conclusion that the Absolute Freezing Exclusion's only other exception, that the insured "shut off the water supply and drained the plumbing and appliance of water[,]" is inapplicable in this case. (J.A. at 60.)

left the basement heat at its lowest setting while the outside temperature was similar to the frigid temperatures experienced in February 2015 without water freezing within the home. The Jugans cannot establish reasonable care now by showing that similarly risky actions in the past did not lead to any harm. Moreover, we agree with the District Court that "a reasonable homeowner would have wanted to check to make sure that the radiators worked before he went away in the winter[,] even if that homeowner, like Mr. Jugan, had never experienced any problems in past." (J.A. at 20-21.) It does not matter that the Jugans had a thermometer in the basement generally observed over two decades to stay at 54°F and that the basement heat was almost always set at its low setting of 40°F, because other evidence suggests Mr. Jugan never tested the basement radiators after they were shut off for repairs the previous summer. That was a material change that rendered reliance on past experience unreasonable. In fact, Mr. Jugan testified that there was no way to know whether the radiators worked at all while he was absent from the home in early 2015. The fact that the thermostat on the main level was on when Mr. Jugan left his home on February 1, 2015, is also not probative of reasonable care to maintain heat, because it does not rebut the expert's conclusion that pipes in the basement froze because the thermostats were set too low, which ultimately caused the boiler to fail when the fuel oil tank ran dry. Thus, we agree with the District Court's conclusion that the Jugans did not point to evidence creating a genuine dispute of material fact that they had used reasonable care under the circumstances.

Second, the District Court did not misapply the sham affidavit doctrine when it struck several averments from Mr. Jugan's affidavit. The sham affidavit doctrine

9

provides that "[w]hen a nonmovant's affidavit contradicts earlier deposition testimony without a satisfactory or plausible explanation, a district court may disregard it at summary judgment in deciding if a genuine, material factual dispute exists." *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017). Averments that are "entirely unsupported by the record and directly contrary to … testimony," or that are "offered 'solely' to defeat summary judgment," may be disregarded. *Id.* (quoting *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253-54 (3d Cir. 2007)). The District Court properly applied those principles to strike Mr. Jugan's averment that, "[w]hen Joseph Jugan traveled away from his home during the winter of 2014-2015[,] he set the thermostat on the main level of his house at 62 degrees Fahrenheit and … set the thermostat in the basement at its low setting." (J.A. at 353.) That definitive averment directly contradicts, without explanation, Mr. Jugan's earlier deposition testimony that he could not say whether the main level thermostat was set to 62°F and that he does not remember the temperature at which the basement thermostat was set at the time of the loss. The Jugans were not free to defeat summary judgment by making last-ditch averments directly contrary to the established record.

Third, whether the Jugans exercised reasonable care to maintain heat in their home is not a question solely for resolution by a jury. Although the issue of reasonable care very often demands a fact-intensive inquiry, summary judgment remains appropriate to dispose of that issue when there is no genuine dispute of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (providing that "summary judgment may be granted" when the evidence supporting the nonmovant "is merely colorable or is not

10

significantly probative" (citation omitted)). The Jugans cite several cases for the proposition that a jury must decide whether a person exercised reasonable care, but even those cases indicate that a court should withhold that question from the jury "where the facts are such that all reasonable men must draw the same conclusion from them[.]" *Grand Trunk Ry. Co. of Can. v. Ives*, 144 U.S. 408, 417 (1892); *see also Bailey v. Cent. Vt. Ry.*, 319 U.S. 350, 353-54 (1943) (indicating that negligence, which involves a question of reasonable care, is an issue appropriately decided by the jury where that issue is of "debatable quality" and "fair-minded men might reach different conclusions"); *Taylor v. President, etc., of Del. & H. Canal Co.*, 8 A. 43, 45 (Pa. 1886) (stating only that whether reasonable care was exercised is "ordinarily" a question for the jury "under all the evidence"). Here, the District Court properly decided the question of reasonable care at summary judgment because there is insufficient evidence upon which a reasonable jury could find that the Jugans exercised reasonable care to maintain heat in their home, given the unrebutted expert testimony and Mr. Jugan's admissions during discovery.

Fourth, the Jugans argument that the District Court erred by not accounting for Mr. Jugan's disability in the reasonable care analysis does not help their case. The Jugans cite to *Smith v. Sneller*, 26 A.2d 452 (Pa. 1942), for the proposition that "the standard of reasonable care under Pennsylvania law takes into account [a person's] 'infirmity' or disability." (Opening Br. at 18.) But *Smith* indicates that a person with a disability would exercise "a higher degree of caution than a normal person" to compensate for his disability. *Smith*, 26 A.2d at 453-54.

11

Finally, we are unpersuaded by the Jugans' contention that the District Court erred when it failed to take into account their reasonable expectations under the contract. Pennsylvania law provides that, regardless of whether an insurance contract is ambiguous, the court should consider "the reasonable expectation of the insured" when construing that contract. *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1253 (Pa. Super. Ct. 2008). The District Court recognized that principle of insurance contract interpretation in its well-reasoned decision.[6] But the Jugans have pointed to no evidence that would establish a reasonable expectation of coverage under the Policy in the circumstances demonstrated on this record.

## III. Conclusion

For the foregoing reasons, we will affirm the grant of summary judgment in favor of MetLife.

---

[6] We note, however, that the Supreme Court of Pennsylvania has cast doubt upon the breadth of that interpretive principle. *See Madison Constr. Co. v. Harleysville Mut. Ins.*, 735 A.2d 100, 109 n.8 (Pa. 1999) (declining to decide whether to adopt the contention "that the reasonable expectations of the insured must be considered, regardless of the express terms of the policy," which is a contention it described as "a substantial expansion of the reasonable expectations doctrine, heretofore applied in very limited circumstances").