UNITED NATIONAL INSURANCE COMPANY, et al.

v.

INDIAN HARBOR INSURANCE COMPANY.

CIVIL ACTION NO. 14-6425

United States District Court, E.D. Pennsylvania.

Signed February 8, 2016

---

Gale White, Anthony L. Miscioscia, White & Williams, Philadelphia, PA, for United National Insurance Company, et al.

Cara Tseng Duffield, David H. Topol, Karen L. Toto, Wiley Rein LLP, Washing-ton, DC, Jason P. Gosselin, Drinker Biddle & Reath LLP, Philadelphia, PA, for Indian Harbor Insurance Company.

## MEMORANDUM

Bartle, District Judge.

Before the court are the cross-motions for summary judgment of plaintiff Penn-America Insurance Company ("Penn-America") and defendant Indian Harbor Insurance Company ("Indian Harbor").

Penn-America was insured by Indian Harbor under a professional liability insurance policy ("Indian Harbor policy"). Penn-America has sued Indian Harbor in this diversity action alleging breach of contract, breach of duties, and waiver and estoppel.[1] It alleges that Indian Harbor improperly failed to pay Penn-America or Penn-America's insureds amounts owed under the Indian Harbor policy in connection with two separate underlying coverage disputes involving Penn-America's insureds.

Indian Harbor has moved for summary judgment on the meaning and application of the Indian Harbor policy in Counts I and III as well as on Penn-America's "breach of duties" claim in Count II. Penn-America has moved for summary judgment in four separate motions and four accompanying briefs.[2] Those motions request summary judgment on Indian Harbor's affirmative defenses two through twelve, partial summary judgment that the allocation provision in the Indian Harbor policy does not apply, partial summary judgment that Indian Harbor breached its contractual obligation to "pay on behalf of"

---

1. We previously granted the motion of Indian Harbor for judgment on the pleadings on Penn-America's reformation claim. We have dismissed all claims brought by plaintiff United National Insurance Company and dismissed the third party defendant Diamond State Insurance Company.

2. By filing four separate motions and briefs, Penn-America has improperly circumvented, without the approval of the court, the page limits set forth in the court's scheduling order for summary judgment briefs.

Penn-America, and partial summary judgment that Indian Harbor may not as a matter of law deny coverage based on Exclusion (H) in the Indian Harbor policy.

## I.

The following facts are not in dispute. Both coverage claims at issue here arise under the Indian Harbor policy issued to United America Indemnity, Ltd. Penn-America was insured under the policy as a subsidiary of United America Indemnity, Ltd.[3] Under the Indian Harbor policy, Penn-America retained the first $1,000,000 per claim.

Penn-America's first claim arises out of an automobile accident caused by a patron of Peccadillos, Inc. ("Peccadillos"), Penn-America's insured. The accident resulted in the deaths of two women and injuries to two children, collectively referred to as the "Swartwood claimants." The Swartwood claimants sued Peccadillos in the Pennsylvania state court alleging liquor liability, punitive damages, and outrageous conduct/infliction of emotional distress. At the time, Peccadillos had a Penn-America insurance policy for $1,000,000 (hereinafter "Penn–America policy"). This policy excluded coverage for liquor liability.

After the Swartwood claimants filed suit against Peccadillos, Penn-America denied coverage based on the liquor liability exclusion in the Penn-America policy and took the affirmative step of suing for a declaratory judgment that it had no obligation to defend Peccadillos or to provide coverage. Affirming a decision by the Court of Common Pleas of Erie County, a nine-judge panel of the Pennsylvania Superior Court held that Penn-America had a duty to defend on behalf of Peccadillos because some of the Swartwood claims fell outside the scope of the liquor liability exclusion. The court did not reach the issue of coverage. See Penn–America Ins. Co. v. Peccadillos, Inc., 27 A.3d 259, 268–69 (Pa.Super.Ct.2011).

While the declaratory judgment action was pending, Penn-America refused a demand by the Swartwood claimants to settle for the $1,000,000 Penn-America policy limit. Peccadillos and Swartwood then entered into consent judgments totaling $5,000,000 and sued Penn-America for breach of contract, common law bad faith, and statutory bad faith based on Penn-America's conduct in the original action. Penn-America settled this lawsuit against it for $3,500,000 in June 2014 (hereinafter "Peccadillos settlement"). It is one of the settlements which is at issue here.

Penn-America sought compensation of $2,500,000 from Indian Harbor for the Peccadillos settlement. This sum represented the $3,500,000 settlement minus the $1,000,000 retention. Penn-America asserted that the entire amount claimed was covered under the Indian Harbor policy. Indian Harbor subsequently paid $1,500,000 towards the Peccadillos settlement as well as $355,440.21 towards the defense fees and costs. This left $1,000,000 of the settlement above the retention, which Penn-America now seeks to recover from Indian Harbor.

The second settlement stemmed from a lawsuit filed by Colleen Jackson ("Jackson") against Penn-America's insured, Sweet & Sassy, Inc. ("Sweet & Sassy"), after she was injured in an automobile accident by one of Sweet & Sassy's intoxicated patrons. Penn-America defended Sweet & Sassy in that action. Jackson litigated the case for more than six years before receiving a $1,020,000 jury verdict against Sweet & Sassy in a Kentucky state

---

**3.** It appears that there are two separate Indian Harbor policies that apply to the two coverage disputes, but because the policies are identical, we will refer to them both as the Indian Harbor policy.

court.[4] After the verdict, Penn-America settled the case with Jackson on behalf of Sweet & Sassy for $1,028,250.

Jackson then amended her complaint to add claims against Penn-America for acting in bad faith by failing to make a reasonable settlement offer earlier in the litigation in spite of clear liability. She sought $350,000 in compensatory damages for anxiety, mental anguish, worry, stress, and inconvenience. She also sought $3.4 million in punitive damages, statutory interest, and attorney's fees. The claim for statutory interest was dismissed by the state court. Penn-America settled these claims with Jackson for $1,350,000 in October 2010 (hereinafter "Jackson settlement"). Penn-America made a claim under the Indian Harbor policy for $350,000, the amount of the settlement above the $1,000,000 retention, plus attorney's fees. Again, Penn-America asserted that the entire Jackson settlement represented payment for losses covered under the Indian Harbor policy. Indian Harbor did not pay anything towards the Jackson settlement because it determined that covered losses fell below the $1,000,000 retention.

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is granted where there is insuffi-

cient record evidence for a reasonable factfinder to find for the nonmovant. See id. at 252, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id.

█ When ruling on a motion for summary judgment, we may only rely on admissible evidence. See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 94–95 (3d Cir.1999). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir.2004). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990).

█ A party asserting that a particular fact "cannot be or is genuinely disputed" must support its assertion by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties. See Fed. R. Civ. P. 56(c)(3). It is not the responsibility of the court to "comb the record in search of disputed facts." See N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Development Agency, 68 F.Supp.3d 545, 549 (D.N.J.2014). Our Court of Appeals has emphasized that " '[j]udges are not like pigs, hunting for truffles buried in' the record." Doeblers'

---

4. At her first trial, Jackson won a $1,060,000 verdict against Sweet & Sassy, but the verdict was overturned on appeal as a result of erroneous jury instructions.

Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n. 8 (3d Cir.2006) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991)).

As noted above, both sides have moved for summary judgment. When confronted with cross-motions for summary judgment, our task remains the same, as such motions:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968)). We must consider the motions separately. See, e.g., Wernicki–Stevens v. Reliance Standard Life Ins. Co., 641 F.Supp.2d 418, 422 (E.D.Pa.2009) (citing Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co., 10 F.3d 144, 150 (3d Cir.1993)).

## III.

We now turn to the relevant provisions in the Indian Harbor policy. The parties do not dispute that, in this diversity action, the substantive law of Pennsylvania applies. See, e.g., Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir.2000).

The interpretation of an insurance policy is a question of law for the court. See Pac. Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir.1985); 401 Fourth St., Inc. v. Inv'rs Ins. Grp., 583 Pa. 445, 879 A.2d 166, 171 (2005). The primary goal is to "ascertain the parties' intentions as manifested by the policy's terms." See Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 589 Pa. 317, 908 A.2d 888, 897 (2006). When the language of the policy is clear, we give effect to its plain meaning. See Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc., 606 Pa. 584, 2 A.3d 526, 540 (2010). Yet, "when a provision in the policy is ambiguous, 'the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy and controls coverage.'" Kvaerner Metals Div. of Kvaerner U.S., Inc., 908 A.2d at 893 (quoting 401 Fourth St., Inc., 879 A.2d at 170). Policy language is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." Madison Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 106 (1999)

The Indian Harbor policy is not an all-risk policy but rather a policy that only covers certain specific risks subject to exclusions. The Indian Harbor policy provides in Part I that "[t]he Insurer will pay on behalf of the **Insured Loss** from **Claims** first made against the **Insured** during the **Policy Period** ... for **Wrongful Acts**."[5] The parties agree that Penn-America's claims for coverage based on the Peccadillos and Jackson settlements were "**Claims**"[6] made by an "**Insured**" during the "**Policy Period**." The parties do not dispute that the Indian Harbor policy cov-

---

**5.** It appears that the policy uses bold text to set apart terms and phrases defined therein. To the extent that we quote from the policy, all bold text in this opinion appears in the policy and has not been added by the court.

**6.** "**Claim**" is defined as, among other things, "any civil proceeding in a court of law or equity, including any mediation or alternative dispute resolution ordered or sponsored by such court" and "a written demand or notice to an **Insured** indicating that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act**."

ers, as a "**Wrongful Act**," a claim against Penn-America alleging bad faith conduct. "**Wrongful Acts**" are defined as "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an **Insured** in rendering, or in failing to render, **Professional Services**."[7] However, they disagree on the meaning and application of other provisions in the policy, including a provision allocating coverage (the "allocation provision") and Exclusion (H).

The allocation provision in the Indian Harbor policy provides a mechanism for apportioning losses covered by the policy and losses not covered by the policy. Apportionment comes into play, for example, where Penn-America settles an underlying lawsuit which alleges individual claims or counts against Penn-America and some of the claims are covered under the Indian Harbor policy and some are not covered. Under these circumstances, it must be decided how much if any of the settlement will be the ultimate responsibility of Indian Harbor. The allocation provision in the Indian Harbor policy provides:

> [i]f both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insured** includes both covered and uncovered matters or because a **Claim** is made against both the **Insured** and others not included within the definition of **Insured**, the **Insured** and

the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts. The determination of a fair and proper allocation shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insureds**. In the event that an allocation cannot be agreed to, then the Insurer will make an interim payment of the amount of **Loss**, including **Defense Expenses**, which the parties agree is not in dispute until a final amount is agreed upon or determination pursuant to the provisions of this Policy and applicable law.

Penn-America argues that the allocation provision requires Indian Harbor to cover the Peccadillos and Jackson settlements because the word loss is written in bold text with a capitalized first letter. In particular, the first clause reads: "**Loss** covered by this Policy and **Loss** not covered by this Policy." Penn-America claims that the bold text and capitalization limit the allocation provision to the narrow category of loss as defined in Part II of the Indian Harbor policy. Part II specifically states, in relevant part, that "**Loss** shall not include...matters which are uninsurable under the law pursuant to which this Policy shall be construed...[and] any amount due under any contract or policy of insurance."[8] On this theory, because the defini-

---

7. The policy also contains additional definitions of "**Wrongful Acts**" which are not relevant here.

8. Part II provides:

> "**Loss**" means damages, judgements [sic], awards, settlements, and the **Defense Expenses** which an **Insured** is legally obligated to pay as a result of a **Claim**. **Loss** includes punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed. Where the **Insurance Company** has determined in good faith that punitive or exemplary dam-

ages are insurable under applicable law, the Insurer will not raise as a defense to coverage the insurability of such damages; provided, however, that in the event of a challenge to such a determination by any other person or entity, the Insurer shall be obligated to reimburse such damages only if a court of competent jurisdiction specifically determines that they are insurable. **Loss** shall not include:

> . . .

> (2) matters which are uninsurable under the law pursuant to which this Policy shall be construed;

tion of **"Loss"** excludes contract liability, the allocation provision never assigns contract liability to Penn-America.

 Penn-America's interpretation is both absurd and unreasonable. An insurance policy provision "must be given a reasonable interpretation, in the light of the subject-matter and the situation [sic] of the parties at the time the contract was made, and such construction must not be manifestly absurd, nor effectually prevent a recovery under all circumstances." See Janney v. Scranton Life Ins. Co., 315 Pa. 200, 173 A. 819, 820 (1934). If, in drafting the allocation provision, the parties had intended to distribute losses only within the narrow category of **"Loss"** as defined in the policy, the allocation provision would have no apparent meaning. Losses excluded by the Part II definition of **"Loss"** must be uncovered losses within the meaning of the allocation provision. Otherwise we could not distinguish between covered and uncovered losses in the allocation provision.

Moreover, Penn-America's interpretation destroys the meaning of the next clause of the allocation provision, which explains that the provision applies where "a **Claim** made against the **Insured** includes both covered and uncovered matters." According to Penn-America's interpretation, this clause applies only where an insured makes a single coverage claim based upon two separate settlements. This cannot possibly be the meaning of this provision. The allocation provision clearly allocates to Indian Harbor matters within the Part II definition of **"Loss"** and to

Penn-America matters expressly excluded by the Part II definition.

Exclusion (H) of the Indian Harbor policy provides:

> [t]he Coverage under this Policy does not apply to any **Claim**:
>
> . . .
>
> for an **Insured's** liability under any contract or agreement, regardless of whether such liability is direct or assumed; provided, that this EXCLUSION (H) will not apply to **Loss** an **Insured** would have sustained even in the absence of a contract or agreement or to preclude coverage for **Wrongful Acts** committed, or allegedly committed, in rendering **Professional Services** pursuant to a policy of insurance or other **Express Contract or Agreement.**

Under Exclusion (H), Penn-America cannot seek compensation from Indian Harbor for its contract liability on a Penn-America policy it issued to one of its insureds. Consistent with Part I of the Indian Harbor policy,[9] Exclusion (H) carves out of the exclusion wrongful acts committed or allegedly committed by Penn-America. Part I clearly establishes that the policy insures Penn-America for wrongful acts, and Exclusion (H) confirms that coverage. Thus, when a complaint includes allegations of both contract liability and bad faith conduct, Exclusion (H) reiterates the declaration in Part I of the policy that coverage exists for the bad faith conduct which is a wrongful act, while excluding coverage for the contract liability which is not a wrongful act as previously noted. Part I and Exclusion (H) demonstrate that

. . .

(6) any amount due under any contract or policy of insurance or reinsurance underwritten, issued, assumed, or subscribed to by the **Insurance Company.**

"**Insurance Company**" refers to Penn-America, and, as relevant, " '**Defense Expenses'** means reasonable legal fees and expenses in-

curred by or on behalf of any **Insured** in the defense or appeal of any **Claim.**"

**9.** As noted above, Part I provides that "[t]he Insurer will pay on behalf of the **Insured Loss** from **Claims** first made against the **Insured** during the **Policy Period**. . .for **Wrongful Acts.**"

a contract liability claim against Penn-America is never covered under the Indian Harbor policy.

 It is critical here to determine which party has the burden of proof on the issue of allocation. Where the policy provides coverage for a certain type of loss, the insured has the burden of proving that the covered loss occurred. See Betz v. Erie Ins. Exch., 957 A.2d 1244, 1256 (Pa.Super.Ct.2008)). "[The Pennsylvania] Supreme Court has long recognized that 'it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy.'" Id. (quoting Miller v. Boston Ins. Co., 420 Pa. 566, 218 A.2d 275, 277 (1966)). On the other hand, when the dispute involves an exclusion in the insurance policy, "the burden is upon the insured to show that a loss has occurred; thereafter, the burden is on the insurer to defend by showing that the loss falls within a specific policy exclusion." Wexler Knitting Mills v. Atl. Mut. Ins. Co., 382 Pa.Super. 405, 555 A.2d 903, 905 (1989).

 Our Court of Appeals, interpreting Pennsylvania law, has recognized that "there is a subset of exclusion cases that concerns exceptions to exclusions." See Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co., 25 F.3d 177, 180 (3d Cir.1994). In these cases, "[t]he burden is on the insured, not the insurer, to introduce evidence to show that the exclusion which appears to be triggered does not apply after all." See id. (citing N. Ins. Co. v. Aardvark Assocs., Inc., 942 F.2d 189, 191 (3d Cir.1991)).

 Acknowledging these principles, the Pennsylvania Superior Court held in Executive Risk Indemnity, Inc. v. Cigna Corp., 74 A.3d 179 (Pa.Super.Ct.2013), that "the insured is the party that should bear the burden of proof for apportionment of claims" where the insured seeks coverage for a settlement that it resolved without a finding on liability. See id. at 183; see also John Hancock Healthplan of Pa., Inc. v. Lexington Ins. Co., 1990 WL 21137, at *3 (E.D.Pa. Mar. 6, 1990); Lang Tendons, Inc. v. N. Ins. Co., 2001 WL 228920, at *11 (E.D.Pa. Mar. 7, 2001).

 Allocation "is best proven by the insured, the party that has access to the evidence and the parties' intent behind the settlement process." See Exec. Risk Indem., Inc., 74 A.3d at 183; John Hancock Healthplan of Pa., Inc., 1990 WL 21137, at *3. The Superior Court explained:

> [where] the parties were equally sophisticated entities, [and the insured] drafted the settlement agreement, chose counsel to participate in the settlement negotiations, controlled the underlying litigation and defense and had better access to the relevant information and intentions of the parties in the deliberative settlement process. . . . it is not only reasonable, but logical, that the insured bears the burden to allocate.

Exec. Risk Indem., Inc., 74 A.3d at 183.

The dispute here concerns coverage for wrongful acts, which are specifically covered risks, and does not involve the application of a policy exclusion. Part I expressly provides that the Indian Harbor policy applies to wrongful acts. Thus, because Penn-America is the insured seeking coverage under the Indian Harbor policy for its wrongful acts, "it is a necessary prerequisite to recovery" that Penn-America proves that the Peccadillos and Jackson settlements concerned covered wrongful acts. See Betz, 957 A.2d at 1256; Miller, 218 A.2d at 277.

 Likewise, as our Court of Appeals explained, where, as here, the case concerns a carve out to an exclusion, the insured has the burden to prove that the exclusion does not apply. See Air Prods. & Chems., Inc., 25 F.3d at 180. Thus, where

Penn-America seeks to recover for an entire settlement which includes both breach of contract and bad faith claims, the burden is on Penn-America to prove that the exclusion in Exclusion (H) does not apply.

Finally, Executive Risk specifically places the burden of proof on the insured, in this case, Penn-America, in any allocation of covered and uncovered losses in the Peccadillos and Jackson settlements. See Exec. Risk Indem., Inc., 74 A.3d at 183. As the insured did in Executive Risk, Penn-America "drafted the settlement agreement[s] and was fully aware that allocation between the classes of claims would become a coverage issue" when it settled those actions without findings on liability.[10] See id.

Accordingly, we will deny the motions of Penn-America for partial summary judgment that the allocation provision in the Indian Harbor policy does not apply and for partial summary judgment that Indian Harbor may not as a matter of law deny coverage for the Peccadillos settlement based on Exclusion (H).

## IV.

We now consider the motion of Indian Harbor for summary judgment with regard to the Peccadillos settlement.[11] This settlement resolved the lawsuit brought by Peccadillos and the Swartwood claimants against Penn-America alleging statutory bad faith, common law bad faith, and breach of contract.[12] It is undisputed that the alleged bad faith conduct of Penn-America in the underlying Peccadillos action constituted wrongful acts covered by the Indian Harbor policy. Penn-America asserts that the breach of contract claim is also covered by the Indian Harbor policy. As explained above, the only risks covered are those that come within the definition of a "**Wrongful Act.**" That definition does not include claims based on contract liability.

Indian Harbor concedes that it paid $1,500,000 of the $3,500,000 settlement to Penn-America because, in its view, $1,500,000 was the appropriate compensation for the claims alleging bad faith conduct covered under the policy. The first $1,000,000 of the $3,500,000 settlement was subject to the retention clause. According to Indian Harbor, Penn-America has not produced any evidence that the remaining $1,000,000 was for covered wrongful acts.

To prevent summary judgment in favor of Indian Harbor, Penn-America must present at least a genuine dispute of material fact in support of its claim on coverage or allocation. See Fed. R. Civ. P. 56; Betz, 957 A.2d at 1256; Executive Risk, 74 A.3d

---

**10.** We note that while counsel for Penn-America opposes application of the Executive Risk burden of proof in this case, the same counsel supported application of Executive Risk in the underlying Peccadillo's action where placing the burden on the insured was to Penn-America's benefit as the insurer.

**11.** We construe Indian Harbor's motion and Penn-America's response as reaching both Counts I and III of the complaint.

**12.** We treat the breach of contract claim as a claim for contract liability. Penn-America argues in some, but not all, of its many summary judgment briefs that the breach of contract claim is based on a wrongful act and not contract liability. However, in response to Indian Harbor's requests for admission, Penn-America stated: "Penn-America admits that the Swartwood claimants and Peccadillos asserted, in the Peccadillos Coverage Action, that, inter alia, Penn-America owed indemnity under its policy." Thus, Penn-America has admitted that Penn-America and Swartwood's breach of contract claim was based on Penn-America's alleged contract liability to Peccadillos under the Penn-America policy. In addition, Penn-America has not offered any admissible evidence that the breach of contract claim was based on anything other than Penn-America's contract liability to Peccadillos under the Penn-America policy.

at 183. Penn-America, however, has not presented any evidence on which a jury could reasonably find that the $1,000,000 of the Peccadillos settlement in dispute represented payment for wrongful acts and not contract liability.

■ Penn-America's reliance on the expert report of James Marnen ("Marnen") is to no avail. First, Penn-America has not submitted an affidavit or declaration by Marnen in support of his report.[13] Our Court of Appeals has held that an unsworn expert report "is not competent to be considered on a motion for summary judgment." See Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir.1989); Burrell v. Minn. Mining Mfg. Co., 2011 WL 5458324, at *1 n. 1 (E.D.Pa. June 9, 2011).

Furthermore, Marnen's opinion does not deal with the underlying bad faith claims of Peccadillos against Penn-America. Penn-America admits that Marnen considered only the contract liability claim and did not evaluate the bad faith claims in assessing the allocation. Since multiple claims were resolved by the Peccadillos settlement, Marnen cannot reliably opine on the value of one claim relative to the settlement amount without considering the other claim. "An allocation is, by its very nature, a determination of the relative value—not the absolute value—of the items being assessed." See, e.g., UnitedHealth Grp., Inc. v. Columbia Cas. Co., 47 F.Supp.3d 863, 877 (D.Minn.2014). As the District Court for the District of Minnesota explained:

> [s]uppose a buyer purchases two paintings at an estate sale for a lump sum of $50 million. One of the paintings is by Picasso, and the other is by a different artist.... No expert could reliably opine on the amount of the $50 million pur-

chase price that should be allocated to the Picasso without examining the other painting. If, for example, the buyer hired an art expert, the expert examined only the Picasso, and the expert opined that the Picasso was worth $50 million, the expert would have established the absolute value of the Picasso. But it would be impossible to say whether all of the $50 million that was paid for the two paintings should be allocated to the Picasso without knowing its value relative to the other painting. And, of course, no one could assess the Picasso's relative value without assessing the value of the other painting.

Id. The opinion of Marnen is not admissible evidence.

■ Penn-America next relies on the deposition testimony of two employees of Global Indemnity Group, Inc., Joyce Romoff ("Romoff") and Mark DiGiovanni ("DiGiovanni"). Global Indemnity Group, Inc. is the parent company of Penn-America. According to Penn-America, this testimony is evidence of Penn-America's subjective intent when settling the Peccadillos action that the entire settlement be allocated to the bad faith claims.

There are several problems with this testimony. First, Penn-America does not cite the record or even attempt to explain in its briefing papers who these individuals are, in what capacity they were employed by Penn-America, or in what capacity they were involved with the Peccadillos action. In fact, it never even identifies the first name of DiGiovanni in its briefs. " 'Judges are not like pigs, hunting for truffles buried in' the record." Doeblers' Pa. Hybrids, Inc., 442 F.3d at 820 n. 8. The deposition testimo-

---

13. We note that Indian Harbor submitted a transcript of Marnen's deposition in support of its motion to strike Marnen's report and testimony. Although this deposition could plausibly stand on its own as admissible evidence, it is not cited by Penn-America and, as explained herein, is not actually admissible.

ny of these individuals cannot create a genuine dispute of material fact because Penn-America does not cite any evidence that these individuals were personally involved in the settlement or had personal knowledge of Penn-America's intent at the time.

■ Second, the testimony cited by Penn-America is not relevant to allocation. This testimony first articulates Penn-America's position that the entire Peccadillos settlement was covered by the Indian Harbor policy. It then describes Penn-America's intent in filing motions in the underlying Peccadillos action, Penn-America's primary concern at settlement, and the deponents' opinions about the settlement. These statements certainly are not evidence that the entire Peccadillos settlement must be allocated to the bad faith claims. Penn-America cannot raise a genuine dispute of material fact that the appropriate allocation of the Peccadillos settlement is entirely to covered claims simply by offering its opinion that the underlying plaintiffs were unlikely to succeed on their contract liability claim.

■ Penn-America also references its responses to Indian Harbor's requests for admissions. However, these responses are not evidence that the Peccadillos settlement concerned only the bad faith claims and not the contract liability claim. We first note that Penn-America may not rely on its responses to the requests for admissions because they are not admissible evidence. "A party may not utilize its own admissions at the trial. It is only when the admission is offered against the party who made it that it comes within the exception to the hearsay rule for admissions of a party opponent." See Charles Alan Wright & Arthur R. Miller, 8B Federal Practice and Procedure § 2264 (3d ed. 2015); In re Leonetti, 28 B.R. 1003, 1009 (E.D.Pa.1983); Fed. R. Evid. 801(d)(2).

In addition, none of Penn-America's responses to the requests for admission is evidence that the entire Peccadillos settlement concerned the bad faith, and not the contract liability, claim. In those responses, Penn-America denied that contract liability was the only issue in the case and denied that contract liability was relevant to Indian Harbor's obligations under the Indian Harbor policy. Yet, Penn-America admitted that Peccadillos and the Swartwood claimants sought coverage from Penn-America under the Penn-America insurance policy. This certainly is not evidence that the settlement concerned only the bad faith claim and not the contract liability claim.

Overall, Penn-America fails to grasp the very nature of settlements in general and of the present settlement in particular. The complaint in the underlying lawsuit brought by Peccadillos and the Swartwood claimants against Penn-America contained claims for bad faith and contract liability. The Peccadillos settlement clearly resolved the entire lawsuit, that is all claims. Penn-America, in the final analysis, simply relies on its argument that the contract liability claim had no merit as a matter of law. Even if it is correct on the lack of merit of the contract liability claim, it cannot reasonably assert, based on the record before us, that no portion of this settlement accounted for the contract liability claim. Settlement payments are often made for a claim even where the law clearly provides that claim is not legally viable. Meritless claims are at times settled in order to avoid legal fees and other costs, consumption of valuable time, distraction from more important matters, adverse publicity associated with continued litigation, and the risk, however remote, that the law might change or be misapplied. A settlement brings peace, resolution, and certainty.

Here, absent the Peccadillos settlement, Penn-America would have been compelled to continue to incur the time and costs related to the contract liability claim until it was ultimately decided by the trial and appellate courts. In sum, Penn-America, which has the burden of proof on allocation and coverage, has produced no evidence in support of its claim that the $1,000,000 in issue was for the covered bad faith claims and not for the uncovered contract liability claim.

Accordingly, we will grant the motion of Indian Harbor for summary judgment on Count I and Count III with respect to the Peccadillos settlement.

## V.

■ We turn to the Jackson settlement. It involved an underlying lawsuit in which Jackson alleged that Penn-America had acted in bad faith in refusing to settle her claims. Jackson had sought both compensatory and punitive damages. Her punitive damages claims were based on allegations that Penn-America's claims adjusters failed to attend mediations, made offers less than their settlement authority, and practiced without licenses in Kentucky. Under the terms of this settlement, Penn-America paid $1,350,000 to Jackson but did not admit liability.

Indian Harbor does not dispute that compensatory damages arising out of the bad faith claims were covered by the policy as wrongful acts. [14] Instead, it argues that the Jackson settlement also resolved claims for uninsurable punitive damages and that any covered losses fell within the $1,000,000 retention in the Indian Harbor policy. Penn-America responds that the entire Jackson settlement related to covered claims, and Indian Harbor must therefore compensate it for all amounts over the $1,000,000 retention.

The Indian Harbor policy states that punitive damages are only covered where they are insurable under Pennsylvania law. The policy reads: "**Loss** includes punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed." [15] The Pennsylvania Superior Court has held that punitive damages directly imposed on a corporation are not insurable while vicariously imposed punitive damages are insurable. See Butterfield v. Giuntoli, 448 Pa.Super. 1, 670 A.2d 646, 655 (1995); Esmond v. Liscio, 209 Pa.Super. 200, 224 A.2d 793, 799–800 (1966). It reasoned that "[w]here corporate management commits an outrageous act, punishment is appropriate," however "[w]here the act is committed by...an agent, not pursuant to corporate policy or plan, the corporation, though vicariously liable for punitive damages, is entitled to insure against such damages." See Butterfield, 670 A.2d at 655 (citation omitted).

---

14. Again, as relevant, "**Wrongful Acts**" are defined in the Indian Harbor policy as "any actual or alleged act, error, omission, misstatement, misleading statement, or breach of fiduciary or other duty committed by an **Insured** in rendering, or in failing to render, **Professional Services**."

15. As relevant, the Indian Harbor policy provides that:

Loss includes punitive or exemplary damages when insurable under the law pursuant to which this Policy shall be construed. When the **Insurance Company** has determined in good faith that punitive or exem-

plary damages are insurable under applicable law, the Insurer will not raise as a defense to coverage the insurability of such damages; provided, however, that in the event of a challenge to such a determination by any other person or entity, the Insurer shall be obligated to reimburse such damages only if a court of competent jurisdiction specifically determines that they are insurable. **Loss** shall not include:

. . .

(2) matters which are uninsurable under the law pursuant to which this Policy shall be construed.

Recently, our Court of Appeals "predict[ed] that the Pennsylvania Supreme Court would conclude that, in an action by an insured against his insurer for bad faith, the insured may not collect as compensatory damages the punitive damages awarded against it in the underlying lawsuit." Wolfe v. Allstate Prop. & Cas. Ins. Co., 790 F.3d 487, 492 (3d Cir.2015). However, that action involved direct, and not vicarious, liability.

We reiterate that Penn-America, as the insured under the Indian Harbor policy, has the burden to prove coverage and allocation. See Exec. Risk Indem., Inc., 74 A.3d at 183; Betz, 957 A.2d at 1256. Thus, on summary judgment, we must consider whether Penn-America has raised a genuine dispute of material fact in support of its claim that its covered losses exceeded the $1,000,000 retention under the Indian Harbor policy. See Fed. R. Civ. P. 56. It has not. It has not come forward with any evidence of what amount if any of the Jackson settlement should be allocated to coverage under the Indian Harbor policy, let alone any evidence that amount exceeded the $1,000,000 retention threshold.

With regard to compensatory damages for the bad faith claim, Penn-America makes no attempt to prove the amount of these damages in the Jackson settlement. Instead, Penn-America simply contends that Jackson's entire claim for punitive damages was covered by the Indian Harbor policy. But, even assuming vicarious liability is insurable under Pennsylvania law, Penn-America does not cite any admissible evidence that any punitive damages in the Jackson settlement were based on Penn-America's vicarious liability.

Penn-America points to unsworn communications written by its own counsel in its attempt to prove that any punitive damages in the Jackson settlement were covered. Even in the unlikely event counsel was planning to testify at trial, Penn-America would have had to have produced sworn testimony or writings by counsel during discovery to defeat the motion of Indian Harbor for summary judgment. A document is not admissible under Rule 56 of the Federal Rules of Civil Procedure unless it is attached to an affidavit or declaration by the author. See Fowle, 868 F.2d at 67.

Penn-America next argues that Indian Harbor, in its briefing papers, admits that no corporate management or corporate policy was involved in the alleged conduct. Penn-America misstates the record. On the page cited by Penn-America, Indian Harbor states that the conduct "reflected company policy, not the rogue acts of a single employee." Indian Harbor then refers to DiGiovanni's testimony, on behalf of Penn-America:

Q: And did Penn America—is it Penn America's corporate policy that adjusters must be licensed in the state in which the claim takes place—

. . .

A: Depends. If the claim is handled by counsel as well, as this was, there is not a requirement that you be licensed.

Clearly, this is not evidence which can defeat Indian Harbor's motion for summary judgment.

Penn-America also cites to Romoff's testimony concerning the Jackson settlement. Yet, as explained above, Romoff's testimony about the Jackson settlement is inadmissible because Penn-America has not pointed to record evidence of her personal knowledge of Penn-America's intent at the time of the Jackson settlement. Further, even if Romoff were qualified to testify on Penn-America's intent at the Jackson settlement, her testimony is not relevant to allocation. On the pages cited by Penn-America, Romoff testifies that she did not believe Penn-America faced any punitive damage exposure and

"couldn't see how Penn-America was even facing the bad faith claim." This testimony is certainly not evidence that the Jackson settlement pertained only to claims covered under the Indian Harbor policy, let alone that the entire $1,350,000 settlement related to covered compensatory damages or vicarious punitive damages.

Lastly, Penn-America objected to Indian Harbor's interrogatory requesting the basis for Penn-America's "contention that Penn-America faced exposure only to vicariously assessed punitive damages and not directly assessed punitive damages in the Jackson Action and identify the evidence that you believe supports your contention." It provided no substantive response in support of its coverage position in the interrogatory just as it has provided no evidence supporting its coverage position on summary judgment.

Accordingly, we will grant summary judgment in favor of Indian Harbor on Count I and Count III because Indian Harbor has not produced evidence that the Jackson settlement was covered to any extent by the Indian Harbor policy.

## VI.

We next address the motion of Indian Harbor for summary judgment on Penn-America's claim for breach of duties in Count II. Count II alleges that Indian Harbor breached its duties to Penn-America by "engag[ing] in a pattern or practice of improperly investigating claims, refusing to pay defense costs and demanding improper allocation of loss in violation of its common law and statutory obligations." Penn-America further accuses Indian Harbor of misrepresenting policy provisions, demanding reinsurance information, relying on provisions of the Indian Harbor policy that do not apply, and wrongfully denying payments to Penn-America.

Indian Harbor seeks summary judgment on the ground that Penn-Amer-ica never specifically cites 42 Pa. Cons. Stat. § 8371, the Pennsylvania bad faith statute. Under Pennsylvania law, "a plaintiff is not obliged to state the legal theory or theories underlying his complaint." See DelConte v. Stefonick, 268 Pa.Super. 572, 408 A.2d 1151, 1153 (1979); Gavula v. ARA Servs., Inc., 756 A.2d 17, 22 (Pa.Super.Ct.2000). Rather, it is enough that "[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form." See Pa. R. Civ. P. 1019(a). The failure to cite § 8371 is not fatal.

Count II further states a claim for relief for breach of duties under Pennsylvania common law. "Section [8371] does not alter [the plaintiff's] common law contract rights." See Birth Ctr. v. St. Paul Cos., Inc., 567 Pa. 386, 787 A.2d 376, 386 (2001). Thus, "[u]nder Pennsylvania law, bad faith by an insurance company can give rise to two separate causes of action: a breach of contract action for violation of an insurance contract's implied duty of good faith, and a statutory action under the terms of Pennsylvania's bad faith statute, 42 Pa. Cons. Stat. § 8371." Wolfe v. Allstate Prop. & Cas. Ins. Co., 790 F.3d 487, 496–97 (3d Cir.2015).

Indian Harbor also argues that Count II is barred by the statute of limitations. A two-year statute of limitations applies for a § 8371 claim. See Haugh v. Allstate Ins. Co., 322 F.3d 227, 236 (3d Cir.2003); Ash v. Cont'l Ins. Co., 861 A.2d 979, 984 (Pa.Super.Ct.2004). The common law breach of duties claim has a four-year statute of limitations. See, e.g., CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co., 645 F.Supp.2d 354, 364–65 (E.D.Pa.2009). The "[d]efendant bears the burden of establishing as a matter of law that plaintiff's claims are barred by the statute of limitations." See Goddard v. State Farm Mut. Auto. Ins. Co., 992 F.Supp.2d 473, 478

(E.D.Pa.2014) (citing Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 487 (3d Cir.1985)).

The statute of limitation starts to run when the plaintiff's right to institute and maintain the suit arises. "[A] claim accrues when a plaintiff is harmed and not when the precise amount or extent of damages is determined." Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1042 (Pa.Super.Ct.1999). A bad faith claim accrues when the insurer denies coverage. See Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 224–25 (3d Cir.2005). "Thus, where an insurer clearly and unequivocally puts an insured on notice that he or she will not be covered under a particular policy for a particular occurrence, the statute of limitations begins to run and the insured cannot avoid the limitations period by asserting that a continuing refusal to cover was a separate act of bad faith." CRS Auto Parts, Inc., 645 F.Supp.2d at 365. "Repeated or continuing denials of coverage do not constitute separate acts of bad faith giving rise to a new statutory period." Goddard, 992 F.Supp.2d at 478.

Indian Harbor first notified Penn-America on October 6, 2010 that it did not have a claim for compensation under the Indian Harbor policy for the Jackson settlement. On that date, Indian Harbor advised Penn-America that "it is Indian Harbor's view that . . . the amount of covered Loss, together with Defense Expenses . . . would not exceed the $1 million retention amount." Therefore, this claim for relief accrued on October 6, 2010. However, the present action was not filed until October 9, 2014, more than four years after the claim accrued. As such, both the statutory and common law breach of duties claims are barred by the statute of limitations with regard to the Jackson settlement.

As for the Peccadillos action, Indian Harbor did not deny coverage to Penn-America until June 2014. The statute of limitations clearly does not bar the statutory or common law bad faith claims in the Peccadillos action. Hence, we now must consider whether Penn-America produced any evidence that the alleged breach of duties took place.

Penn-America has the burden to prove the bad faith of Indian Harbor alleged in Count II. See, e.g., Polselli v. Nationwide Mut. Fire Ins. Co., 23 F.3d 747, 751 (3d Cir.1994). Yet, Penn-America has not pointed us to any evidence in the record supporting its claim with respect to the Peccadillos settlement. Rather, Penn-America cites to the entire 215-page transcript of DiGiovanni's deposition. Not only does Penn-America fail to "cit[e] to particular parts of materials in the record" as required by the Federal Rules of Civil Procedure, it also does not explain what admissible evidence is contained in that transcript. See Fed. R. Civ. P. 56(c). Again, it is not our role to review the deposition to find evidence helpful to Penn-America. See Fed. R. Civ. P. 56(c)(3); Doebler's Pa. Hybrids, Inc., 442 F.3d at 820 n. 8. Penn-America has failed to demonstrate that DiGiovanni's testimony is relevant or admissible evidence.

Penn-America then cites to Exhibit 16, a sixteen-page document, which it describes as stating Penn-America's responses to Indian Harbor's interrogatories. It contends that this document includes a detailed list of Indian Harbor's bad faith conduct. However, Exhibit 16 contains "Indian Harbor's Objections and Responses to Penn-America's First Set of Interrogatories." We have examined this document written by Indian Harbor in response to Penn-America's interrogatories and, as one might expect, it does not contain a list of Indian Harbor's bad faith conduct. Not even the interrogatories themselves, which were presumably written by counsel for Penn-America, mention Indian Harbor's alleged

bad faith. Exhibit 16 is not evidence in support of Penn-America's claim.

 Penn-America also refers to the deposition testimony of Dan Bailey ("Bailey"), an insurance expert for Indian Harbor. On the pages cited by Penn-America, Bailey states his belief that, in the general context of resolving insurance disputes, the parties should use their best efforts. This is nothing more than a precatory statement completely detached from the facts at issue in this action. In addition, Penn-America does not explain the relevance of Bailey's testimony to this action. Bailey's testimony is not evidence supporting Count II of the complaint.

We will grant the motion of Indian Harbor for summary judgment on the breach of duties claim in Count II of the complaint. [16]

### VII.

 Finally, we will deny the motion of Penn-America for summary judgment based on the alleged breach by Indian Harbor of "the pay on behalf of" provision of the Indian Harbor policy. That provision states: "[t]he Insurer will pay on behalf of the **Insured Loss** from **Claims** first made against the **Insured** during the **Policy Period**...for **Wrongful Acts**." Penn-America alleges that Indian Harbor breached this provision by failing to make payments directly to the Jackson and Peccadillos claimants. Indian Harbor counters that no such breach occurred because Penn-America waived this provision in connection with the Peccadillos settlement and the provision was not applicable to the Jackson settlement.

 Waiver is the "voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed." Den–Tal–Ez, Inc. v. Siemens Capital Corp., 389 Pa.Super. 219, 566 A.2d 1214, 1223 (1989) (citation omitted). Waiver may take place in one of three ways. First, "express waiver is in the nature of a new contract, which modifies the old." Id. Second, "an estoppel, on the other hand, forbids the assertion of the truth, i.e. the contract, by one who has knowingly induced another to believe what is untrue, i.e. that strict contractual compliance will not be demanded, and as such misleads another to act accordingly." Id. Third, "implied waiver exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived." Id.

With regard to the Peccadillos settlement, Indian Harbor paid $1,500,000 plus defense costs to the parent company of Penn-America, Global Indemnity Group, Inc., for the bad faith claims. In doing so, Indian Harbor acted pursuant to Penn-America's specific and detailed instructions. In an August 1, 2014 letter, Penn-America wrote:

> [t]he claimants are in the process of finalizing and submitting their motion(s) to approve the settlement. Once the settlement is approved, payment will become due. To allow us to be able to make payment in a timely fashion, please forward XL's [17] settlement pay-

---

**16.** Penn-America argues that Indian Harbor engaged in bad faith conduct during this litigation after this action was filed. Count II alleges a breach of duties based on Indian Harbor's conduct prior to litigation. If Penn-America seeks to allege new acts of bad faith conduct separate and apart from the acts alleged in Count II, it must bring a separate lawsuit based upon those acts.

**17.** XL Professional Insurance is the corporation that handled the Peccadillos settlement on behalf of Indian Harbor.

ment to Penn-America as soon as you can.

(emphasis added). Then, on August 11, 2014, Penn-America stated that "[p]ayment should be directed as follows: Global Indemnity Group, Inc., P.O. Box 821417, Philadelphia, PA 19182-1417" and "[Penn-America's] W9 is attached."

When Penn-America specifically instructed Indian Harbor to pay Global Indemnity Group, Inc. in these August 2014 communications, Penn-America waived any obligation Indian Harbor may have had to make payment directly to the underlying claimants. Penn-America now disingenuously argues that it made these August 2014 requests only because Indian Harbor had previously refused to honor its requests for payment directly to the claimants. Penn-America refers to an October 2010 communication in which it cited Part I of the policy, among many other provisions. This October 2010 communication came nearly four years before the Peccadillos settlement and Penn-America's demand that payment be made to its parent company. Penn-America cannot refute its specific requests in August 2014 by citing a four-years old, generalized reference to the Indian Harbor policy. This October 2010 communication is not admissible evidence on the issue of Penn-America's waiver.

Penn-America also maintains that its August 2014 request was made only after Indian Harbor refused its June 2014 requests for payment directly to the underlying claimants. But those June 2014 communications were demands that Indian Harbor pay the entire Peccadillos settlement, not instructions that Indian Harbor make payments directly to the claimants. They state: "XL is required to pay the settlement on behalf of the insured, not merely contribute to the settlement"; "we again demand that XL live up to its obligations under the policy to pay the full settlement in excess of retention"; and "[w]e look forward to confirmation from XL that it will fund the settlement." These demands are not evidence that can overcome Penn-America's waiver. It simply is not correct for Penn-America to say it requested a payment to its parent company only after Indian Harbor refused to pay the claimants directly. Thus, Penn-America has waived the "pay on behalf of" provision with regard to the Peccadillos settlement.

Furthermore, there is no evidence that Indian Harbor owes Penn-America any sum of money for the Jackson settlement. Because Indian Harbor does not owe anything for the Jackson settlement, there cannot have been a breach of the "pay on behalf of" provision.

Accordingly, we will deny the motion of Penn-America for partial summary judgment that Indian Harbor breached its contractual obligation under the "pay on behalf of" provision. [18]

---

18. We will also deny as moot: (1) the motion of Penn-America for summary judgment as to affirmative defenses two through twelve raised by Indian Harbor; (2) the motion of Indian Harbor to strike the report and proposed testimony of plaintiff's expert James Marnen; and (3) the motion of Indian Harbor to strike the report and proposed testimony of plaintiff's expert Michael Aylward. Penn-America never cited to Michael Aylward's report or testimony in its summary judgment briefs.