J-S56028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAYON LIMENE PINDER | : | No. 960 EDA 2020 |

Appeal from the Order Entered March 5, 2020,
in the Court of Common Pleas of Chester County,
Criminal Division at No(s):  CP-15-CR-0001119-2019.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED:  MAY 7, 2021**

The Commonwealth appeals from the order granting a new trial to

Dayon Limene Pinder.  We reverse and remand for reinstatement of the jury's

verdict of guilt and the judgment of sentence.

This case concerns a burglary which occurred in the early morning hours

of January 5, 2019, in a townhouse leased by six fraternity brothers attending

West Chester College in Chester County, Pennsylvania.  The tenants of the

townhouse, located at 134 Lacey Street, were Michael Stegers, Jeff Gernon,

John McHenery, Matt Sprake, Ryan Heurich, and Matt Krayowski.  The

townhouse has three stories and five bedrooms.  Stegers and Gernon had

bedrooms on the first floor.  McHenry's bedroom was located on the second

_____

[*] Retired Senior Judge assigned to the Superior Court.

floor. Sprake, Heurich, and Krayowski had bedrooms on the third floor. The burglary occurred during the college winter break for the townhouse occupants.

Sprake was staying in the townhouse over the break because he was taking winter session classes. The remaining housemates were there occasionally over the break. On January 4, 2019, Sprake was the only occupant of the townhouse. He went to bed around midnight in his third-floor bedroom. On the morning of January 5, 2019, he received a telephone call from Gernon, asking him to open the front door because Gernon had forgotten his front door key. It was then that Sprake and Gernon discovered that both bedrooms on the first floor (belonging to Gernon and Stegers) had been ransacked. Gernon observed that several of his possessions were missing, including his Xbox, MacBook Air laptop, headphones, phone chargers, guitar, prescription medications, and his black North Face backpack. Sprake then called police, and Gernon called Stegers to inform him of the burglary.

Stegers returned to the townhouse on the afternoon of January 5, 2019. One of the two windows in Stegers' first-floor bedroom had been opened and appeared to be the entry point for the burglar. There were handprints on the outside glass of both of the windows in Stegers' room, indicating an upward pushing motion. Stegers observed that several of his belongings were missing, including his Xbox, HP Spectre laptop, two iPads, two watches, and $600 in cash that his parents had given him for Christmas. Stegers had an

electronic door pad on the main door to his room which automatically locked the door every time it closed. Stegers room was also connected by a common door to the bedroom occupied by Gernon. The common door had a lock on both sides, but was usually left unlocked by Stegers and Gernon except at night when they were sleeping.

Officer Ryan Donkin initially responded to the call and met with Sprake and Gernon before police detectives arrived to process the crime scene. Detectives attempted to obtain fingerprints from the windows to Stegers' room and throughout the first floor which might be usable for processing. Most of the prints were smudged or on surfaces not conducive to processing. However, Detective Robert Kuehn was able to pull a partial palm print from the open window in Stegers' room. The partial palm print was sent to the Pennsylvania State Police crime lab for analysis, which subsequently informed Detective Kuehn that the print belonged to Pinder. None of the occupants of the townhouse knew Pinder, nor had any of them given Pinder permission to enter the townhouse or take their belongings.

Detectives then investigated whether Pinder had recently pawned or sold any of the stolen items in the area. That investigation led police to American Cash Traders, where detectives met with the manager, Sterling Whitfield, who indicated that Pinder had been to the store on January 10, 11, and 12, 2019, and had sold him two Xboxes, a MacBook Air laptop, and a couple of watches. Detectives took the Xboxes from American Cash Traders

and were able to identify them as belonging to Stegers and Gernon by their serial numbers. Detectives also obtained from American Cash Traders in-store surveillance video of the three transactions, as well as the documentation associated with the transactions which detailed Pinder's name and signature, the form of identification he used, a description of the items Pinder sold, and receipts for the amounts paid to Pinder.

Police obtained a warrant for Pinder's arrest and thereafter encountered him at a homeless shelter, where they arrested him. At the time of his arrest, Pinder was carrying a black North Face backpack, which Gernon identified as the one stolen from his bedroom. Police fingerprinted Pinder using the LiveScan machine to roll his fingers, thumbs, and palms. Using the Analysis, Comparison, Evaluation, and Verification ("ACE-V") method, Corporal Melissa Sanzick, an expert in latent print examination and comparison who works at the Pennsylvania State Police AFIS lab in Bethlehem, Pennsylvania, compared the LiveScan print samples taken from Pinder to the partial print taken from burglary scene. Based on her analysis, she concluded that the partial palm print recovered at the scene of the burglary belonged to Pinder. Police then charged Pinder with burglary, criminal trespass, theft by unlawful taking, and receiving stolen property.

The matter proceeded to a jury trial in September 2019. The Commonwealth presented nine witnesses, including Detective Kuehn, Officer Donkin, Gernon, Stegers, and Sprake. Corporal Sanzick provided expert

testimony that the partial palm print taken from the townhouse matched Pinder's palm print taken at the police station. The Commonwealth also presented the testimony of the manager of American Cash Traders, Whitfield, who positively identified Pinder in open court as the person in the surveillance videos, and narrated each transaction he had with Pinder. After four days of proceedings, the jury found Pinder guilty of the above-referenced offenses.[1]

On November 15, 2019, the trial court imposed an aggregate sentence of ten to twenty years in prison. Pinder filed a post-sentence motion claiming, *inter alia*, that the verdict was against the weight of the evidence. On March 30, 2020, the trial court entered an order granting Pinder a new trial on the basis that the verdict was against the weight of the evidence.[2] The trial court judge who entered the order, the Honorable Phyllis R. Streitel, did not provide any oral or written explanation of record for her decision, and retired shortly after entering the order. The Commonwealth filed a timely notice of appeal, and a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Due to Judge Streitel's retirement, the matter was reassigned to another trial court judge, the Honorable Analisa Sondergaard, who authored a Pa.R.A.P.

_____

[1] 18 Pa.C.S.A. §§ 3502, 3503, 3921, 3925.

[2] The trial court denied the other forms of relief requested in Pinder's post-sentence motion or deemed them moot due to the grant of a new trial on the weight challenge.

1925(a) opinion in support of Judge Streitel's order granting Pinder a new trial.

The Commonwealth raises the following issue for our review:

WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW IN AWARDING [PINDER] A NEW TRIAL BASED ON A WEIGHT OF THE EVIDENCE CLAIM, WHERE THE VERDICT WAS CLEARLY NOT AGAINST THE WEIGHT OF THE EVIDENCE, AND WHERE THERE IS NO BASIS IN LAW OR FACT TO SUPPORT SUCH A CLAIM?

Commonwealth Brief at 6 (capitalization in original).

A new trial should be granted only in truly extraordinary circumstances. *Armbruster v. Horowitz*, 813 A.2d 698, 703 (Pa. 2002). In order for a trial court to grant a defendant a new trial based on a weight of the evidence challenge, the defendant must establish that the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court. *Commonwealth v. Talbert*, 129 A.3d 536, 545-46 (Pa. Super. 2016). Given its unique vantage point, the trial court is ordinarily obligated to rule on challenges to the weight of the evidence and to explain its reasoning through an opinion filed pursuant to Rule 1925(a), reserving for this Court the role of reviewing the trial court's analysis for a palpable abuse of discretion. *See Armbruster*, 813 A.2d at 702-03.[3] However, our Supreme Court created an

_____

[3] *Cf*. *Commonwealth v. DeJesus*, 868 A.2d 379, 383 (Pa. 2005) (requiring remand "where the trial court fails to prepare an opinion that addresses the issues upon which it passed and which are raised by a party on appeal"—a requirement, which under ordinary circumstances, is not dependent "upon the reason for the absence of an independent articulation by the court below of the reasons for its decisions.").

exception for this Court to review timely-filed weight claims in the first instance under circumstances where the trial judge is permanently unavailable to do so, "including resignation, illness, death, and retirement, appointment to another court and election defeat." **Armbruster**, **supra** at 704. In such situations, "the claim must be reviewed by the appellate tribunal in the first instance" to avoid an untenable "burden upon the judicial process that would be occasioned by a rule requiring a new trial whenever the trial judge is unavailable to rule upon a post-verdict motion." **Id**.

In the instant matter, Judge Streitel, as the presiding trial court judge, did rule on Pinder's weight of the evidence challenge. However, she subsequently retired, and did not provide any explanation of record as to the basis for her determination that the verdict shocked her conscience. Thus, because Judge Streitel is "permanently unable" to explain her reasoning through an opinion filed pursuant to Rule 1925(a), and this Court is left with no means to review her analysis, we must review her ruling in the first instance. Under these circumstances, our standard of review is plenary, though we are confined to the "cold record of the trial proceedings" in conducting our review. **Commonwealth v. Izurieta**, 171 A.3d 803, 808 (Pa. Super. 2017). Our role, therefore, is to review the entire record and

determine whether Judge Streitel correctly determined that the jury's verdict was against the weight of the evidence. *Id*.[4]

The following legal principles apply when a challenge to the weight of the evidence supporting a conviction is presented to the trial court:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror.

_____

[4] We are mindful that in both *Armbruster* and *Izurieta*, the presiding judge did not rule on the weight challenge, and the responsibility fell to a successor judge to consider and rule on the weight challenge based on a cold record. In our view, the fact that Judge Streitel ruled on Pinder's weight challenge prior to her retirement does not require us to employ a discretionary standard of review when evaluating that ruling. *See Izurieta*, 171 A.3d 803 at 809 (holding that the successor judge's opinion should not be afforded the level of discretion given to a judge who presided at the trial in question). Since Judge Streitel did not provide any explanation of record for her ruling, it remains unknown as to why the verdict shocked her conscience. The fact that Judge Sondergaard has authored an opinion pursuant to Pa.R.A.P. 1925(a) is of no moment, as she did not preside over the trial proceedings, and did not have the opportunity to observe any of the witnesses or evidence first-hand. *See Armbruster*, 813 A.2d at 703 (observing that "a [presiding] trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence). Thus, Judge Sondergaard's vantage point, like ours, is based on the review of a cold record. *Id*. "Since [Judge Sondergaard] was in no better position than this Court to review the claim in the first instance, our review is plenary." *Id*. at 705 (holding that the Supreme Court's review of the Superior Court's ruling on a weight challenge was plenary where the Superior Court's ruling was based on a cold record).

Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000) (citations, footnotes and quotation marks omitted).

Additionally, when considering a weight challenge on a cold record, we must do so:

with an eye to the delicate balance that exists between the jury's exclusive role in assessing credibility, and our longstanding recognition of the power in courts to allow justice another opportunity to prevail when a verdict nevertheless shocks the judicial conscience.

*Armbruster*, 813 A.2d at 705.

The Commonwealth contends that the verdict was not against the weight of the evidence, and there is no basis in law or fact to support such a claim. The Commonwealth asserts that the evidence of Pinder's guilt was clear, unequivocal, and uncontradicted.

Our independent review discloses that the Commonwealth presented the testimony of Gernon and Stegers that their belongings, including Xboxes, laptops, iPads, watches, a guitar, cash, prescription medications, were stolen and their bedrooms left in disarray while they were away from the townhouse over the winter break. N.T., 9/17/19, at 141, 144, 147-48, 151, 174-75; N.T., 9/18/19, at 26-38, 43-47. The jury was shown photographs of their ransacked bedrooms and the smudged handprints on the outside glass of the

windows in Stegers' room. N.T., 9/17/19, at 144-51, 183-92; N.T., 9/18/19, at 30-38; Exhibits C-4 to C-7, C-12 to C-17, C-19-22.

Sprake testified that no one else was in the townhouse when he went to bed in his third-floor bedroom at approximately midnight on the night of the burglary. N.T., 9/17/19, at 169-73. He further testified that the front door was locked because he had to unlock it the following morning to let Gernon into the townhouse, at which time they discovered the burglary. *Id*. at 169-76. Officer Donkin was the first to respond to the crime scene and observed that a first-floor window was pushed up and had two handprints that were smeared on the glass in an upwards direction, as if somebody was opening the window. *Id*. at 133-35.

Detective Kuehn photographed and processed the crime scene and pulled a partial palm print from the top left corner of the open window in Stegers' room which was believed to be the point-of-entry for the burglar. *Id*. at 181-85, 187-190; N.T., 9/18/19, at 6. Detective Kuehn testified that although other fingerprints going in an upward direction were visible on the open window, they were smudged and, hence, not usable. N.T., 9/17/19, at 186-89, 191-93. Detective Kuehn took measurements from the outside of the townhouse and determined that the distance from the ground to the point where the subject window could slide up was eighty-five inches, or seven feet, one inch. *Id*. at 185-86. The parties stipulated that Pinder's height is six feet, eight inches. N.T., 9/18/19, at 13.

The partial palm print taken by Detective Kuehn was sent to the Pennsylvania State Police crime lab for processing, which informed the detective that the print belonged to Pinder. *Id*. at 6, 15-16, 125. A search of local pawn and resale shop transactions led detectives to American Cash Traders.[5] There, detectives met with the manager, Whitfield, who indicated that Pinder had been to American Cash Traders on three occasions in the week following the burglary, January 10, 11, and 12, 2019, and presented several items for sale. *Id*. at 125-27.

Whitfield testified that, on those three dates, he accepted for sale from Pinder two Xboxes, a MacBook Air laptop, and several watches. *Id*. at 102-5. Whitfield identified several documents from those transactions, including receipts for the items signed by Pinder, along with forms indicating the date and time of each transaction, Pinder's personal information, his form of identification, descriptions of the items he sold, and the amounts he received for the items. *Id*. at 106-11; Exhibits C-24-26. Whitfield further testified that he retrieved in-store surveillance videos of those transactions and provided them to police. *Id*. at 111-13. At trial, Whitfield identified Pinder as the individual depicted in the surveillance videos presenting the specified items

---

[5] American Cash Traders is not a pawn shop because it sells new and used items, and provides cash rather than loans for items it purchases. *See* N.T., 9/18/19, at 100-01. Nevertheless, like a pawn shop, American Cash Traders reports its transactions on a daily basis to a database accessible to police agencies. *Id*. at 121-22.

for sale and signing receipts for the transactions. *Id*. at 113-20; Exhibit C-23.

On January 16, 2019, police arrested Pinder and fingerprinted him by use of a LiveScan machine which automatically sends the collected prints to the Pennsylvania State Police for processing. *Id*. at 49-51. At the time of his arrest, Pinder was carrying a black North Face backpack which Gernon identified as the one taken from his bedroom. *Id*. at 123, 130-31. Police also recovered the two Xboxes that Pinder sold to American Cash Traders, and identified them as the ones stolen from Gernon and Stegers based on their serial numbers. *Id*. at 126.

Corporal Sanzick testified extensively regarding her education, training, certifications, and experience in fingerprint analysis. *Id*. at 55-62. She is one of only ten certified latent print examiners in Pennsylvania, and only one of three employed by the Pennsylvania State Police. *Id*. at 60. Corporal Sanzick had previously testified as an expert in latent print examination and comparison, and Pinder did not challenge her certification as an expert in this case. *Id*. at 61. Corporal Sanzick explained at great length the types of usable body prints and the different methodologies used to collect and compare such prints. *Id*. at 56-73.

Corporal Sanzick completed a comparison between Pinder's LiveScan prints and the partial palm print pulled from the open window in Stegers' bedroom using the ACE-V method. *Id*. at 74, 95. She provided the jury with a step-by-step

description of her analysis, aided by photographs and a power-point presentation. *Id*. at 74-91. Ultimately, Corporal Sanzick concluded that the partial palm print taken from the open window in Stegers' bedroom was made by Pinder. *Id*. at 81.

We acknowledge that Judge Sondergaard determined that her conscience was shocked when, upon reviewing the cold record, she concluded that Judge Streitel and counsel most likely confused the jury regarding the standards for the corporal's testimony as an expert. *See* Trial Court Opinion, 6/19/20, at 47. The portion of the proceedings to which Judge Sondergaard refers began when Corporal Sanzick was asked to state her conclusion. In response, she stated, "[m]y conclusion in my report is that [the] latent palm print . . . was identified to be to the left palm hypothenar area of Pinder." N.T., 9/18/19, p. 83. When asked if she held that opinion to a reasonable degree of professional certainty, she responded, "I don't know what that measurement would be. But it is an acceptable conclusion that was verified. And not only was my latent [print] verified, but my reports are also, technically and administratively reviewed, so everything in the case has been reviewed." *Id*. at 83-84. Thereafter, the following sidebar conversation took place:

> [Defense Counsel]: [Corporal Sanzick] answered, essentially, in the negative when she was asked for an opinion - if her opinion was within the required degree of professional certainty. I don't think that's adequate to have [Corporal Sanzick's] opinion admitted.
>
> [The Prosecutor]: I don't think [Corporal Sanzick] answered in the negative. I think she said, I don't necessarily know what that level

- 13 -

would be, but this is my conclusion, and this is how it's backed up. I don't think you necessarily need the magic word of professional scientific degree of certainty. It's certainly helpful and what we're used to. But I think there is a case on point and I can go pull it, if need be. But I think she's adequately explained her reasoning why she believes it to be, and it's supported.

THE COURT: It's (sic) see Mr. Yen is in the back of courtroom. He is somewhat of an encyclopedia. Maybe he has that in his memory bank. I do not.

[The Prosecutor]: Should I grab him?

THE COURT: Yes.

[Defense Counsel]: It's required for admission of scientific evidence that meets that –

[The Prosecutor]: I think there is a case. I can pull it, if we take a break at some point. I know it doesn't help us at the moment-

THE COURT: You better keep [Corporal Sanzick] around because you have a problem, potentially. Why don't you check with Mr. Yen, for starters.

[The Prosecutor]: Sure.

THE COURT: Off the record.

*Id*. at 84-85.

Thereafter, a brief discussion was held off the record between Judge

Streitel and counsel. *Id*. at 85. Going back on the record, the following

sidebar conversation took place:

[The Prosecutor]: Mr. Yen, I think, is in agreement with what I said, that while [Corporal Sanzick] didn't say the magic words, she has flushed out that they are - her conclusions are in accordance with the accepted methodology in her stated profession. And they are based on that methodology and reviewed under that methodology. So[,] while it's not the magic phrase of –

- 14 -

THE COURT: I really –

[Defense Counsel]: Here we go.  Expert testimony and scientific–

THE COURT: Let me take a look. You are welcome to read this.  I suggest [Corporal Sanzick] is a very difficult witness to listen to because of her presentation and her speed.  I can't stand here and have the court reporter read everything back.  Maybe you want to ask her a follow-up question or two.

[The Prosecutor]: Sure. I can follow up.

THE COURT: You can borrow this book, if you wish.

[The Prosecutor]: Thank you.

[Defense Counsel]: Just so we don't - so it's generally accepted in the scientific community, not just in the PSP lab.

[The Prosecutor]: Okay. I can flush that out.

THE COURT: I don't know what - I don't know how far flung her experience is. I heard mostly [Pennsylvania State Police ("PSP")] stuff.

[The Prosecutor]: Right.

THE COURT: You may want to get into that as well, too.

[The Prosecutor]: Sure, if I may.

*Id*. at 84-85.

In an attempt to clarify Corporal Sanzick's testimony regarding her degree of certainty, the prosecutor further questioned her as follows:

Q Corporal, I actually do have a couple follow up questions for you.

A Okay.

Q Based on your training, experience and in the field of study, the conclusions that you made in this case, are those conclusions up to the acceptable standards of your field of profession?

A Yes, they are.

Q And that would be the ACE-V methodology that we flushed out here today?

A Correct.

Q Is the ACE-V methodology, the accepted standard for latent print examination, not just PSP, but throughout the community?

A Yes, it is.

Q Okay. And those standards that you applied in this case with the latent print pulled and known print used for comparison, those support the conclusions that they are a match?

A Correct. Yes.

THE COURT: What do you mean community, Mr. [prosecutor]?

BY [The Prosecutor]:

Q When I say community, corporal, who is the community of latent print examiners?

A Well, not only do the Pennsylvania State Police utilize ACE-V as methodology for comparing latent prints, but the FBI does, other agencies worldwide. The IAI, the International Association for Identification, in their written policies and procedures have the ACE-V methodology in there as what they use to do comparisons.

Q So all those other agencies use the methodology that you used in this case?

A Correct.

*Id*. at 87-88.

Based on these excerpts from the notes of testimony, Judge Sondergaard determined that the verdict was against the weight of the evidence for the following reasons.

> Reviewing the post-sentence motion with the benefit of the transcripts, the court's notes, and a remembrance of what occurred at the off the record side-bar discussion with counsel, the court now must conclude that confusion was created with regard to the standard of the corporal's testimony as an expert and law regarding the *Frye*[6] standard used for novel scientific evidence.

> When [Corporal Sanzick] was asked the crucial question of whether her conclusion was to a degree of professional certainty, [she] responded, "I don't know what that measurement would be." (N.T., 9/18/19, p. 83). It is well[-]settled that an expert's opinion will not be deemed deficient merely because he or she fails to expressly use the specific words "reasonable degree of professional certainty." *Betz v. Erie Insurance Exchange*, 957 A.2d 1244, 1259 (Pa. Super. 2008). When there was an objection at side-bar and a request to not admit her opinion, counsel and the court reviewed the admission of expert opinions in books that were on hand in the courtroom. (N.T., 9/18/19, pgs. 84-86). [The prosecutor] utilized the book and questioned [Corporal Sanzick] about her conclusions being "up to the acceptable standards of your field of profession" and whether the methodology used was "the accepted standard for latent print examination, not just PSP, but throughout the community?" (N.T., 9/18/19, p. 87). The court compounded the issue by asking counsel, "What do you mean community, Mr. [prosecutor]?" *Id*. [The prosecutor] then asked follow[-]up questions about the meaning of "community." (N.T., 9/18/19, p. 88).

> Pennsylvania courts have held that when an expert testifies about novel scientific evidence, *Frye* "requires analysis of whether the methodology underlying the expert's opinion is generally accepted in the relevant scientific community." *Commonwealth v. Hopkins*, -- A.3d --, 2020 WL 1671579 (Pa. Super. 2020), *quoting Commonwealth v. Blasioli*, 713 A.2d 1117, 1126-27

---

[6] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

(Pa. 1998). "However, 'a *Frye* analysis is not triggered every time science enters the courtroom; it only applies when an expert seeks to introduce novel scientific evidence.'" ***Commonwealth v. Powell***, 171 A.3d 294, 307 (Pa. Super. 2017), *quoting* ***Commonwealth v. Dengler***, 843 A.2d 1241, 1243 (Pa. Super. 2004).

It is abundantly clear that [the prosecutor] was questioning [Corporal Sanzick] under the *Frye* analysis and the court *sua sponte* added to that line of questioning. Latent print examination is certainly not "novel scientific evidence" and questioning under the *Frye* standard for the admission of the expert opinion was improper and confusing.

Being that only one partial print was lifted from the crime scene, and it was that one piece of evidence that led the police to [Pinder] as a suspect, the expert should have been properly questioned for [Pinder] to receive a fair trial. This conclusion is based on the fact that the conscience of the court was shocked when it realized that the court contributed to the error. This is so, even though once [Pinder] was a suspect in the crime, other evidence was found to tie him to the crime. It was determined that notwithstanding all the facts of the case, the fact of the improper questioning of the expert must be of greater weight and to ignore it, or to give it equal weight with all the facts, would be a denial of justice.

Trial Court Opinion, 6/19/20, at 50-52, (unnecessary capitalization omitted footnote added).[7]

_____

[7] Pinder directs this Court to Judge Sondergaard's statement that she reviewed "the court's notes, and a remembrance of what occurred at the off the record side-bar discussion with counsel," when authoring her Pa.R.A.P. 1925(a) opinion. *See* Trial Court Opinion, 6/19/20, at 50. Pinder posits that this passage could mean that Judge Sondergaard was in possession of Judge Streitel's notes, or that the two judges discussed the case. Pinder additionally surmises that Judge Streitel may have authored the Pa.R.A.P. 1925(a) opinion, and Judge Sondergaard merely signed it. Even if Pinder's speculations are correct, it does not alter our analysis, as the fact remains that Judge Streitel did not inform ***this Court*** of her rationale.

Notably, Judge Sondergaard does not dispute that Corporal Sanzick's expert testimony that the partial palm print was made by Pinder met the required standards for definiteness and professional certainty. Instead, the **sole** basis for her determination that a new trial was warranted is that Judge Streitel "contributed to the error" of an unnecessary **Frye** analysis by asking the prosecutor to identify the relevant community. In our view, this issue presents a challenge to the **admissibility** of evidence regarding the relevant scientific community rather than to the **weight** of Corporal Sanzick's properly admitted expert opinion.

Given this distinction, we cannot agree that Judge Streitel's inquiry as to the relevant community warrants a new trial. As a result of her question, Corporal Sanzick explained to the jury that the ACE-V methodology she employed was the accepted standard for latent print examination by the PSP, FBI, IAI, and other agencies worldwide. N.T., 9/18/19, at 87-88. To the extent that the disclosure of this information constitutes an admissibility error, such error does not serve to wholly negate the weight of Corporal Sanzick's separate and properly admitted expert opinion that the partial print on the open window in Steger's bedroom was made by Pinder.

We further disagree with Judge Sondergaard's conclusion that a new trial is warranted because the partial palm print "was that one piece of evidence that led the police to [Pinder] as a suspect." Trial Court Opinion, 6/19/20, at 52. While it is true that Pinder became a suspect based on the

initial print analysis from the Pennsylvania State Police crime lab, that analysis was conducted prior to and separate from Corporal Sanzick's later comparison of the partial palm print from the townhouse to Pinder's LiveScan prints taken at the time of his arrest. Thus, even without the corporal's testimony, the jury was still informed by Detective Kuehn, without any objection by defense counsel, that the initial crime lab analysis of the partial palm print identified it as having been made by Pinder. *See* N.T., 9/18/19, at 125.

Based on our plenary review, we conclude that the Commonwealth's evidence was clear, unequivocal, uncontradicted, and indeed overwhelming. Pinder did not present any evidence in his defense. Thus, we are unable to find any facts in the case which are "so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice" to Pinder. *Widmer*, 744 A.2d at 752. Nor do we find that the Commonwealth's evidence was "so tenuous, vague and uncertain" that the verdict shocks the conscience of this Court. *Talbert*, 129 A.3d at 545. For these reasons, we conclude that Judge Streitel palpably abused her discretion when she determined that the verdict was against the weight of the evidence. Accordingly, we reverse the order granting Pinder a new trial, and remand for reinstatement of the jury's verdict of guilt and the judgment of sentence.

Order reversed, case remanded for reinstatement of verdict of guilt and judgment of sentence. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/7/21